449 F.3d 305
 Joseph HAYDEN, on behalf of himself and all individuals similarly situated; Lumumba Akinwole-Bandelle, Wilson Andino, Gina Arias, Wanda Best-Deveaux, Carlos Bristol, Augustine Carmona, David Galarza, Kimalee Garner, Mark Graham, Keran Holmes, III, Chaujuantheyia Lochard, Steven Mangual, Jamel Massey, Stephen Ramon, Nilda Rivera, Lillian M. Rivera, Mario Romero, Jessica Sanclemente, Paul Satterfield and Barbara Scott, on behalf of themselves and all individuals similarly situated, Plaintiffs-Appellants,
v.
George PATAKI, Governor of the State of New York; Carol Berman, Chairperson, New York Board of Elections; Glenn S. Goord, Commissioner of New York State Department of Correctional Services, Defendants-Appellees.
 Docket No. 04-3886-pr.
 United States Court of Appeals, Second Circuit.
 Argued: June 22, 2005.
 Decided: May 4, 2006.
 Order Clarifying Opinion June 1, 2006.
 
 COPYRIGHT MATERIAL OMITTED Janai S. Nelson (Theodore M. Shaw, Norman J. Chachkin, Ryan P. Haygood, Alaina C. Beverly, NAACP Legal Defense & Educational Fund, Inc., Juan Cartagena, Risa Kaufman, Community Service Society of New York, Joan P. Gibbs, Esmeralda Simmons, Center for Law and Social Justice at Medgar Evers College, of counsel), NAACP Legal Defense & Educational Fund, Inc., New York, NY, for Hayden Plaintiffs-Appellants.
 Michelle M. Aronowitz, Deputy Solicitor General (Caitlin J. Halligan, Solicitor General, Julie Sheridan, Gregory Klass, Benjamin Gutman, Richard Dearing, Assistant Solicitors General, of counsel, Eliot Spitzer, Attorney General of the State of New York, on the brief), New York, NY, for Defendants-Appellees.
 Jessie Allen (Deborah Goldberg, Brennan Center for Justice at New York University School of Law, Julius L. Chambers, Anita Earls, University of North Carolina School of Law Center for Civil Rights, of counsel), Brennan Center for Justice at New York University School of Law, New York, NY, for amici curiae Brennan Center for Justice and the University of North Carolina School of Law Center for Civil Rights in support of Plaintiffs-Appellants.
 
 
 1
 David B. Salmons (Sheldon T. Bradshaw, Principal Deputy Assistant Attorney General, and Cynthia M. McKnight, David K. Flynn, and David White, Attorneys, of counsel, R. Alexander Acosta, Assistant Attorney General, on the brief), Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for amicus curiae United States of America in support of Defendants-Appellees.
 
 
 2
 Peter T. Barbur, Cravath, Swaine & Moore, LLP, New York, NY, for amicus curiae Association of the Bar of the City of New York in support of Plaintiffs-Appellants.
 
 
 3
 Robert Bloom (Matthew Strugar, of counsel), Center for Constitutional Rights, New York, NY, for amici curiae Center for Constitutional Rights, National Alliance of Formerly Incarcerated Persons, Osborne Association, Coalition for Parole Restoration, Voice of the Ex-Offender, Eleventh Episcopal District Lay Organization, Ordinary People Society, Center for Law and Justice, and Malcolm X Center in support of Plaintiffs-Appellants.
 
 
 4
 Michael L. Foreman (Jon M. Greenbaum, Marcia F. Johnson-Blanco, Jonah H. Goldman, Lawyers' Committee for Civil Rights Under Law, Elliot M. Mincberg, Alma C. Henderson, People for the American Way Foundation, Angela Ciccolo, Interim General Counsel, Victor L. Goode, Assistant General Counsel, National Association for the Advancement of Colored People, Grasford W. Smith, Jr., National Black Law Student Association Northeast Region, of counsel), Lawyers' Committee for Civil Rights Under Law, Washington, DC, for amici curiae Lawyers' Committee for Civil Rights Under Law, People for the American Way Foundation, National Association for the Advancement of Colored People, and National Black Law Students Association Northeast Region, in support of Plaintiffs-Appellants.
 
 
 5
 Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for amici curiae Zachary W. Carter, Veronica Coleman-Davis, Scott Lassar, Leonard Marks, Paul Schechtman, National Black Police Association, National Latino Officers Association of America, and 100 Blacks in Law Enforcement Who Care in support of Plaintiffs-Appellants.
 
 
 6
 Johanna Schmitt (Jonathan D. Hacker, Derek R.B. Douglas, Charles E. Borden, Scott M. Hammack, Danielle M. Estrada, of counsel), O'Melveny & Myers LLP, New York, NY, for amici curiae Center for Community Alternatives, National Association of Criminal Defense Lawyers, New York Association for Criminal Defense Lawyers, and the Sentencing Project in support of Plaintiffs-Appellants.
 
 
 7
 Steven R. Shapiro (Arthur N. Eisenberg, New York Civil Liberties Union Foundation, Laughlin McDonald, ACLU Voting Rights Project, of counsel), American Civil Liberties Union Foundation, New York, NY, for amici curiae American Civil Liberties Union and New York Civil Liberties Union in support of Plaintiffs-Appellants.
 
 
 8
 Derek S. Tarson, Debevoise & Plimpton LLP, New York, NY, for amici curiae certain criminologists in support of Plaintiffs-Appellants.
 
 
 9
 Brenda Wright (Lisa J. Danetz, of counsel), National Voting Rights Institute, Boston, MA, for amicus curiae National Voting Rights Institute and Prison Policy Initiative in support of Plaintiffs-Appellants.
 
 
 10
 George T. Conway III (Kenneth K. Lee, Wachtell, Lipton, Rosen & Katz, Kent S. Scheidegger, Criminal Justice Legal Foundation, Roger Clegg, Center for Equal Opportunity, of counsel), Wachtell, Lipton, Rosen & Katz, New York, NY, for amici curiae Diane Piagentini, Mary Piagentini, Deborah Piagentini, The Criminal Justice Legal Foundation, and the Center for Equal Opportunity in support of Defendants-Appellees.
 
 
 11
 Charles J. Cooper (Greg Abbott, Attorney General of Texas, Barry R. McBee, First Assistant Attorney General, Edward D. Burbach, Deputy Attorney General, Litigation, R. Ted Cruz, Solicitor General, Matthew F. Stowe, Deputy Solicitor General, State of Texas, David H. Thompson, Cooper & Kirk, PLLC, of counsel), Cooper & Kirk, PLLC, Washington, DC, for amici curiae States of Texas, Alabama, Arkansas, Colorado, Delaware, Idaho, Michigan, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Utah, Virginia, and Washington in support of Defendants-Appellees.
 
 
 12
 Mitchell S. Garber (Gregory M. Longworth, of counsel), Worth, Longworth & London, LLP, New York, NY, for amicus curiae Patrolmen's Benevolent Association of the City of New York in support of Defendants-Appellees.
 
 
 13
 Before: WALKER, Chief Judge, JACOBS, CALABRESI, CABRANES, STRAUB, POOLER, SACK, SOTOMAYOR, KATZMANN, PARKER, RAGGI, WESLEY, and HALL, Circuit Judges.[1]
 
 
 14
 Chief Judge JOHN M. WALKER, JR., concurs in the judgment and in the opinion of the Court and files a separate concurring opinion, joined by Judge JACOBS.
 
 
 15
 Judge JACOBS concurs in the judgment and in the opinion of the Court and files a separate concurring opinion.
 
 
 16
 Judge STRAUB concurs in the judgment of the Court and in parts I, II, and IV of the opinion of the Court, and files a separate concurring opinion, joined by Judge SACK.
 
 
 17
 Judge SACK concurs in the judgment of the Court and in parts I, II, and IV of the opinion of the Court, and files a separate concurring opinion, part I of which is joined by Judge STRAUB.
 
 
 18
 Judge RAGGI concurs in the judgment and in the opinion of the Court and files a separate concurring opinion, joined by Judge JACOBS.
 
 
 19
 Judge PARKER dissents, in an opinion in which Judges CALABRESI, POOLER, and SOTOMAYOR concur.
 
 
 20
 Judge CALABRESI dissents in a separate opinion.
 
 
 21
 Judge SOTOMAYOR dissents in a separate opinion.
 
 
 22
 Judge KATZMANN dissents in a separate opinion.
 
 
 23
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 24
 We have granted en banc review in order to decide whether plaintiffs can state a claim for violation of Section 2 of the Voting Rights Act ("VRA" or the "Act"), 42 U.S.C. § 1973, based on allegations that a New York State statute that disenfranchises currently incarcerated felons and parolees, N.Y. Election Law § 5-106, results in unlawful vote denial and vote dilution. Muntaqim v. Coombe, 396 F.3d 95 (2d Cir.2004). We consider two cases that were consolidated for the purpose of oral argument: Muntaqim v. Coombe, which was dismissed by the United States District Court for the Northern District of New York (Norman A. Mordue, Judge) on a motion for summary judgment, a decision which was then affirmed by a three-judge panel of this Court, Muntaqim v. Coombe, 366 F.3d 102 (2d Cir.2004); and Hayden v. Pataki, which raises substantially identical claims, was dismissed on the pleadings by the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge), Hayden v. Pataki, No. 00 Civ. 8586(LMM), 2004 WL 1335921 (S.D.N.Y. June 14, 2004), and was consolidated with the Muntaqim en banc without having been considered by a three-judge panel.[2] Simultaneously with the filing of this opinion, the en banc court has (1) entered an order deconsolidating the Muntaqim and Hayden cases, and (2) filed a separate opinion vacating the District Court's opinion in Muntaqim on the ground that the plaintiff in that case lacked standing to bring a claim.
 
 
 25
 We recognize that this case poses a complex and difficult question that, absent Congressional clarification, will only be definitively resolved by the Supreme Court. Indeed, this is the second time we have considered this question as an en banc court. See Baker v. Pataki, 85 F.3d 919 (2d Cir.1996) (affirming District Court judgment after evenly dividing on the merits); see also Muntaqim, 366 F.3d at 104 (recognizing that "this is a difficult question that can ultimately be resolved only by a determination of the United States Supreme Court"). Nevertheless, the question is now before us, and we hold that the Voting Rights Act does not encompass these felon disenfranchisement provisions, and, consequently, affirm the judgment of the District Court. Our holding is based on our conclusion that Congress did not intend or understand the Voting Rights Act to encompass such felon disenfranchisement statutes, that application of the Voting Rights Act to felon disenfranchisement statutes such as these would alter the constitutional balance between the States and the Federal Government, and that Congress at the very least did not clearly indicate that it intended the Voting Rights Act to alter the federal balance in this way.
 
 I.
 
 26
 Before turning to the substantive questions raised by this case, we summarize the path this case has taken since Muntaqim's complaint was first filed in 1994. We assume familiarity with the panel decision in Muntaqim and will limit our discussion of that opinion to facts necessary to explain our resolution of the present case. We also set forth here the background of the Hayden case, which no three-judge panel of this Court has yet addressed.
 
 
 27
 Muntaqim is a black inmate at the Shawangunk Correctional Facility in Wallkill, New York, and is currently serving a maximum sentence of life imprisonment after being convicted of two counts of murder in the first degree for killing two New York City police officers on May 21, 1971. On September 26, 1994, he filed a pro se complaint against several officials of the New York State Department of Correctional Services (collectively, "defendants") alleging, inter alia, that New York Election Law § 5-106 violates the Voting Rights Act because it "results in a denial or abridgement of the right . . . to vote on account of race." 42 U.S.C. § 1973(a). On January 24, 2001, upon defendants' motion for summary judgment, the District Court entered judgment in favor of defendants. An appeal followed.
 
 
 28
 A unanimous panel of this Court issued a decision on April 23, 2004, affirming the District Court's dismissal of the claim. Muntaqim, 366 F.3d at 104. The panel concluded that
 
 
 29
 in light of recent Supreme Court decisions that have clarified the scope of Congress's enforcement power under the Reconstruction Amendments, the application of the Voting Rights Act to felon disenfranchisement statutes such as that of New York would infringe upon the states' well-established discretion to deprive felons of the right to vote. Because the Supreme Court has instructed us that statutes should not be construed to alter the constitutional balance between the states and the federal government unless Congress makes its intent to do so unmistakably clear, we will not construe the Voting Rights Act to extend to New York's felon disenfranchisement statute.
 
 
 30
 Id. (footnote omitted).
 
 
 31
 On October 1, 2004, our Court voted to deny en banc review. Muntaqim v. Coombe, 385 F.3d 793, 793-94 (2d Cir. 2004). Following the Supreme Court's denial of certiorari, 543 U.S. 978, 125 S.Ct. 480, 160 L.Ed.2d 356 (2004), we revisited the case and agreed to rehear the case en banc, pursuant to Fed. R.App. P. 35(a). Muntaqim v. Coombe, 396 F.3d 95, 95 (2d Cir.2004). The en banc proceeding was convened to determine "whether, on the pleadings, a claim that a New York State statute, Section 5-106 of the New York Election Law, that disenfranchises currently imprisoned felons and parolees results in unlawful vote dilution, can state a claim for violation of Section 2 of the Voting Rights Act." Id.
 
 
 32
 The Hayden plaintiffs filed their initial complaint on November 9, 2000. The complaint names twenty-one plaintiffs, of whom six are currently incarcerated and four are currently on parole. Plaintiffs' amended complaint, filed March 18, 2003, challenges "New York State's unconstitutional and discriminatory practice of denying suffrage to persons who are incarcerated or on parole for a felony conviction and the resulting discriminatory impact that such denial of suffrage has on Blacks and Latinos in the State." Plaintiffs styled their complaint as a class action, with the class to include three subclasses: "(a) Black and Latino prisoners who are of lawful voting age, citizens of the United States, currently incarcerated in New York State as a result of a felony conviction, and otherwise qualified to vote but for their incarceration resulting from a felony conviction; (b) Black and Latino parolees who are of lawful voting age, citizens of the United States, currently on parole in New York State as a result of a felony conviction, and otherwise qualified to vote but for their parole resulting from a felony conviction; and (c) Black and Latino persons who are of lawful voting age, citizens of the United States, qualified to vote and denied an equal opportunity to participate in the political process in New York State because of the disproportionate disfranchisement under New York State Election Law § 5-106(2) of Black and Latino persons who are incarcerated or on parole for a felony conviction." Am. Compl. ¶ 29. Plaintiffs allege both vote denial and vote dilution claims under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Id. ¶¶ 87-93.
 
 
 33
 On June 14, 2004, the District Court issued a Memorandum and Order granting defendants' motion for judgment on the pleadings and dismissing all of plaintiffs' claims. Hayden v. Pataki, No. 00 Civ. 8586(LMM), 2004 WL 1335921, 2004 U.S. Dist. LEXIS 10863 (S.D.N.Y. June 14, 2004). As relevant for this appeal, the District Court summarily dismissed plaintiffs' Voting Rights Act claim in reliance on Muntaqim. The District Court's complete discussion of the issue was as follows:
 
 
 34
 Plaintiffs' claims under Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. §, 1973, must be dismissed in light of the Second Circuit's recent holding in Muntaqim v. Coombe, 366 F.3d 102 (2d Cir.2004). There the Second Circuit held that "§ 1973 cannot be used to challenge the legality of § 5-106." Id. at 104.
 
 
 35
 Id. at *5, 2004 U.S. Dist. LEXIS 10863 at *16.[3] Plaintiffs timely filed a notice of appeal.
 
 
 36
 After questions arose regarding Muntaqim's standing, we directed the filing of supplemental letter briefs on the question, and on February 24, 2005, we consolidated Hayden with Muntaqim for consideration en banc. Oral argument on the consolidated cases took place before the en banc court on June 22, 2005. In a separate opinion, we are dismissing Muntaqim for lack of standing.
 
 II.
 A. Statutory Provisions
 
 37
 Section 5-106 of the New York Election Law provides that no person convicted of a felony "shall have the right to register for or vote at any election" unless he has been pardoned, his maximum sentence of imprisonment has expired, or he has been discharged from parole.[4] Accordingly, no resident of New York State who is presently incarcerated for a felony or is on parole may vote in local, state, or federal elections.[5]
 
 
 38
 Felon disenfranchisement has a long history in New York. The New York State Constitution of 1821 authorized the state legislature to enact laws disenfranchising those convicted of "infamous crimes." N.Y. Const. of 1821, art II, § 2. The state legislature passed such a law the next year. Act for Regulating Elections, ch. 250, § 25, 1822 N.Y. Laws 280. This law, as revised, has been in effect in the State ever since. It was modified in 1971 to provide that those convicted of felonies would automatically regain the right to vote once their maximum sentence had been served or they had been discharged from parole. Act of May 25, 1971, ch. 310, § 2, 1971 N.Y. Laws 952-53. In 1973, New York again amended the statute to ensure that felons were only disenfranchised if they were sentenced to a term of imprisonment and not if they were sentenced to fines, probation, or conditional discharge. Act of June 11, 1973, ch. 679, §§ 2-5, 1973 N.Y. Laws 2247-48.
 
 
 39
 Section 2 of the Voting Rights Act, codified at 42 U.S.C. § 1973(a) and originally enacted in 1965, currently provides:
 
 
 40
 No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .
 
 
 41
 42 U.S.C. § 1973(a).[6] Section 1973(b), originally enacted in 1982, states, in relevant part, that "[a] violation of subsection (a) . . . is established if, based on the totality of circumstances, it is shown that . . . members [of protected minority groups] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).
 
 
 42
 The current language of § 1973 was enacted by Congress as part of the Voting Rights Act Amendments of 1982, Pub.L. No. 97-205, § 3, 96 Stat. 131, 134, largely in response to the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). See Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In Bolden, a plurality of the Court held that racially neutral state action violates § 1973 only if it is motivated by a discriminatory purpose. 446 U.S. at 62, 100 S.Ct. 1490. The amended version of § 1973 eliminates this "discriminatory purpose" requirement and, instead, prohibits any voting qualification or standard that "results" in the denial of the right to vote "on account of" race.
 
 B. Interpreting the Voting Rights Act
 
 43
 We do not write on a clean slate in addressing the question whether the Voting Rights Act encompasses felon disenfranchisement statutes. We ourselves considered this issue as an en banc court in 1996 but did not definitively resolve the issue at that time because we were evenly divided on the matter. Baker v. Pataki, 85 F.3d 919 (2d Cir.1996) (en banc). The Eleventh Circuit recently considered this question as an en banc court and, in an opinion by Judge Phyllis Kravitch, relying on the canon of statutory construction that counsels avoidance of potential constitutional infirmities, held that the provisions of the Voting Rights Act do not encompass felon disenfranchisement laws. Johnson v. Gov. of State of Florida, 405 F.3d 1214 (11th Cir.2005) (en banc). By contrast, a panel of the Ninth Circuit has determined that the Voting Rights Act does apply to felon disenfranchisement provisions. Farrakhan v. Washington, 338 F.3d 1009 (9th Cir.2003). Over a dissent written by Judge Alex Kozinski and joined by six other judges, the Ninth Circuit denied the defendant's petition for rehearing en banc. See Farrakhan v. Washington, 359 F.3d 1116, 1116 (9th Cir.2004).[7] In light of the lengthy discussions of these cases (except the Johnson en banc) in the panel opinion, see Muntaqim, 366 F.3d at 107-15, we need not elaborate on them here, except as relevant for our analysis.
 
 C. Vote Denial
 
 44
 We thus confront the question whether the VRA applies to a claim that a prisoner disenfranchisement statute such as § 5-106, acting in combination with historic racial discrimination allegedly afflicting the New York criminal justice system as well as society at large, results in the denial to Black and Latino prisoners of the right to vote "on account of race or color."[8] New York's statute, it is important to emphasize, disenfranchises only currently incarcerated prisoners and parolees. N.Y. Election Law § 5-106. In this respect, the statute may not raise the same issues that are implicated by provisions disenfranchising for life those convicted of felonies, such as the provision of the Florida Constitution addressed in the Eleventh Circuit's recent decision in Johnson or by the provision of the Washington Constitution addressed in Farrakhan.
 
 
 45
 The question whether a prisoner disenfranchisement statute such as New York's can be challenged under § 1973 depends primarily on our interpretation of the Voting Rights Act itself, as we must first determine whether the Act applies to such statutes at all. If the VRA does not encompass such statutes, that would end our inquiry; if, conversely, we conclude that it may apply to felon disenfranchisement laws, we would then need to evaluate such an interpretation of the VRA in light of its implications for our constitutional jurisprudence and the structure of our federal system.[9]
 
 
 46
 We thus consider the scope of § 1973. As we have noted, "[i]n interpreting a statute, we must first look to the language of the statute itself," and that "[i]f the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words." Greenery Rehab. Group v. Hammon, 150 F.3d 226, 231 (2d Cir.1998). The Supreme Court has made clear that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). There is no question that the language of § 1973 is extremely broad — any "voting qualification or prerequisite to voting or standard, practice, or procedure" that adversely affects the right to vote — and could be read to include felon disenfranchisement provisions if the phrase is read without the benefit of context and background assumptions supplied by other statutory and Constitutional wording, by history, and by the manifestations of intent by Congress at the time of the VRA's enactment and thereafter.
 
 
 47
 We are not convinced that the use of broad language in the statute necessarily means that the statute is unambiguous with regard to its application to felon disenfranchisement laws. In any event, our interpretation of a statute is not in all circumstances limited to any apparent "plain meaning." As Justice Holmes has observed, "[i]t is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928). Here, there are persuasive reasons to believe that Congress did not intend to include felon disenfranchisement provisions within the coverage of the Voting Rights Act, and we must therefore look beyond the plain text of the statute in construing the reach of its provisions. See Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect."). These reasons include (1) the explicit approval given such laws in the Fourteenth Amendment;[10] (2) the long history and continuing prevalence of felon disenfranchisement provisions throughout the United States; (3) the statements in the House and Senate Judiciary Committee Reports and on the Senate floor explicitly excluding felon disenfranchisement laws from provisions of the statute; (4) the absence of any affirmative consideration of felon disenfranchisement laws during either the 1965 passage of the Act or its 1982 revision; (5) the introduction thereafter of bills specifically intended to include felon disenfranchisement provisions within the VRA's coverage; (6) the enactment of a felon disenfranchisement statute for the District of Columbia by Congress soon after the passage of the Voting Rights Act; and (7) the subsequent passage of statutes designed to facilitate the removal of convicted felons from the voting rolls. We therefore conclude that § 1973 was not intended to — and thus does not — encompass felon disenfranchisement provisions.
 
 D. Felon Disenfranchisement
 
 48
 The starting point for our analysis is the explicit approval given felon disenfranchisement provisions in the Constitution. Section 2 of the Fourteenth Amendment provides that "when the right to vote at any [federal] election . . . is denied to any of the male inhabitants of [a] State . . . or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced . . . ." U.S. Const. amend. XIV, § 2 (emphasis added). The Supreme Court has ruled that, as a result of this language, felon disenfranchisement provisions are presumptively constitutional. Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (rejecting a nonracial Equal Protection challenge to the felon disenfranchisement provision of California's constitution).[11]
 
 
 49
 Indeed, the practice of disenfranchising those convicted of crimes is of ancient origin. Professor Mirjan R. Damaska of the Yale Law School, among others, has recounted that in ancient Athens, the penalty for certain crimes was placement in a state of "infamy," which entailed the loss of those rights that enabled a citizen to participate in public affairs, such as the rights to vote, to attend assemblies, to make speeches, and to hold public office. Mirjan R. Damaska, Adverse Legal Consequences of Conviction and their Removal: A Comparative Study, 59 J.Crim. L., Criminology & Police Sci. 347, 351 (1968). The Roman Republic also employed infamy as a penalty for those convicted of crimes involving moral turpitude. Id.
 
 
 50
 The infamy practice in the ancient world over the years evolved into "civil death" laws in Medieval continental countries and into the "attainder" laws of Medieval England, which caused all family and political rights to be forfeited as additional punishment for crimes carrying sentences of death or life imprisonment. Id. The loss of any generally available voting rights was not a prominent focus of these attainder laws, for, as Judge Friendly wryly noted, "with nearly all felonies punishable by death in 18th century England, the voting rights of convicted felons had not been a very live issue there." Green v. Bd. of Elections, 380 F.2d 445, 450 (2d Cir.1967) (citation omitted). In Nineteenth Century Continental Europe, it was not uncommon for penal statutes to prescribe "the deprivation of the right to vote, to elect and to be elected . . . ." Damaska, 59 J.Crim. L., Criminology & Police Sci., at 352-53 (citing statutes from Belgium, Italy, Luxembourg, Monaco, Spain, Egypt, and Chile).
 
 
 51
 Similar laws disenfranchising felons were adopted in the American Colonies and the Early American Republic as well. In his opinion in Green v. Board of Elections, a 1967 nonracial challenge to New York's felon disenfranchisement provision (as it was at the time), Judge Friendly noted that "eleven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons," Green, 380 F.2d at 450 (footnote omitted), and that "twenty-nine states had such provisions when the Fourteenth Amendment was adopted" in 1868. Id.[12] Today, likewise, every state except Maine and Vermont disenfranchises felons. See Developments in the Law: One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L.Rev.1939, 1942 (2002). As the Eleventh Circuit noted, quoting the panel opinion in Muntaqim, "`considering the prevalence of felon disenfranchisement [provisions] in every region of the country since the Founding, it seems unfathomable that Congress would silently amend the Voting Rights Act in a way that would affect them.'" Johnson, 405 F.3d at 1234 (quoting Muntaqim, 366 F.3d at 123-24). We now proceed to determine whether Congress in fact intended to do so.[13]
 
 
 52
 E. Congressional Intent in the Voting Rights Act
 
 
 53
 The Voting Rights Act, enacted in 1965, "was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). "The Act creates stringent new remedies for voting discrimination where it persists on a pervasive scale, and in addition the statute strengthens existing remedies for pockets of voting discrimination elsewhere in the country." Id. By its terms, the 1965 Act, prior to its subsequent amendment in 1982, prohibited States (or their political subdivisions) from imposing or applying any "voting qualification or prerequisite to voting, or standard, practice, or procedure . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color." Id. at 338, 86 S.Ct. 803. It is indisputable that the Congress intended "to give the Act the broadest possible scope." Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).
 
 
 54
 We do not believe that this general intent answers the specific question regarding whether the Act covers felon disenfranchisement laws, as it is equally indisputable that Congress did not explicitly consider felon disenfranchisement laws to be covered by the Act and indeed affirmatively stated that such laws were not implicated by provisions of the statute. In discussing Section 4(c) of the Voting Rights Act, 42 U.S.C. § 1973b(c) — which banned any "test or device" that limited the ability to vote to those individuals with "good moral character" — the Senate Judiciary Committee Report stated that the provision "would not result in the proscription of the frequent requirement of States and political subdivisions that an applicant for voting or registration for voting be free of conviction of a felony or mental disability." S.Rep. No. 89-162, at 24 (1965), reprinted in 1965 U.S.C.C.A.N. 2508, 2562 (joint views of Senators Dodd, Hart, Long, Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and Javits); see also H.R.Rep. No. 89-439, at 25-26 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2457 ("This subsection does not proscribe a requirement of a State or any political subdivision of a State that an applicant for voting or registration for voting be free of conviction of a felony or mental disability.").[14] Senator Joseph D. Tydings of Maryland "emphasize[d]" on the Senate floor that Section 4(c) was not intended to prohibit "a requirement that an applicant for voting or registration for voting be free of conviction of a felony or mental disability. Those grounds for disqualification are objective, easily applied, and do not lend themselves to fraudulent manipulation." 111 Cong. Rec. S8366 (daily ed. April 23, 1965) (statement of Sen. Tydings).[15]
 
 
 55
 Though these statements were made in the context of a particular VRA provision not at issue here — the provision banning any "test or device" — it is apparent to us that Congress's effort to highlight the exclusion of felon disenfranchisement laws from a VRA provision that otherwise would likely be read to invalidate such laws is indicative of its broader intention to exclude such laws from the reach of the statute. Indeed, the emphatic language chosen to provide assurance that felon disenfranchisement laws remain unaffected by the statute suggests that these statements be read to indicate that "not even this section applies to felon disenfranchisement laws," rather than "this section does not apply to felon disenfranchisement laws, but other sections might," as plaintiffs argue.
 
 
 56
 Further indications that Congress in 1965 did not intend or understand the Voting Rights Act (or its subsequent amendments) to apply to felon disenfranchisement provisions come from the unsuccessful attempts in the early 1970s to amend the statute to apply to such provisions. Following hearings by the House Judiciary Committee in 1972 to address "The Problems of the Ex-Offender," see Hearings on Corrections, Part VI, Illinois: The Problems of the Ex-Offender, Before Subcomm. No. 3 of the House Comm. on the Judiciary, 92d Cong. (1972), several notable proponents of the VRA, Representatives Robert W. Kastenmeier of Wisconsin, John Conyers, Jr. of Michigan, William Fitts Ryan of New York, Abner J. Mikva of Illinois, and Hamilton Fish, Jr. of New York, jointly introduced a bill designed "[t]o amend the Voting Rights Act of 1970 to prohibit the States from denying the right to vote in Federal elections to former criminal offenders who have not been convicted of any offense related to voting or elections and who are not confined in a correctional institution." H.R. 15049, 92d Cong. (1972). The bill was thus expressly intended to amend the Voting Rights Act to encompass the very laws that plaintiffs in the instant case insist were already covered by the 1965 Act. Apparently, no further action was taken on this bill.
 
 
 57
 In the next Congress, in 1973, Representative Kastenmeier, a supporter of the Voting Rights Act of 1965 and a "principal architect" of the re-authorization of the Voting Rights Act in 1968 as well as the enactment of the Civil Rights Act of 1964, see 102 Cong. Rec. S18797 (daily ed. Nov. 27, 1991) (statement of Sen. Kohl), introduced a new bill with the identical text. H.R. 9020, 93d Cong. (1973). A hearing on the proposed bill was held before the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice (of which Representative Kastenmeier was Chairman) on January 30, 1974 and, as the published transcript indicates, was entirely predicated on the understanding that the Voting Rights Act did not cover felon disenfranchisement laws. Accordingly, the hearing focused on whether such an amendment to the VRA would be constitutional and whether it was sound policy. See Ex-Offenders Voting Rights: Hearing on H.R. 9020 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 93d Cong. 1-38 (1974).[16] None of the Representatives who spoke at the hearing so much as intimated that the proposed bill was made unnecessary by the fact that the statute already encompassed felon disenfranchisement laws.
 
 
 58
 The proposed bills of 1972 and 1973 thus reveal that the law was not understood by those most familiar with it to encompass felon disenfranchisement provisions. Furthermore, because these proposed bills only sought to add Voting Rights Act coverage to those who were no longer "confined in a correctional institution," it is yet more implausible that the Voting Rights Act was understood to apply to prisoner disenfranchisement statutes. We are mindful, "`[o]f course, [that] the view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value.'" Gozlon-Peretz v. United States, 498 U.S. 395, 406, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) (quoting Bell v. New Jersey, 461 U.S. 773, 784, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983)). Here, the persuasive value of the subsequent legislative efforts is further enhanced by the temporal proximity of the later Congresses that understood the Voting Rights Act not to apply to felon disenfranchisement provisions and by the related fact that a number of the Representatives involved in the hearings were the very same legislators who had participated in the enactment of the original VRA just a few years earlier.
 
 
 59
 In this regard, it is also telling that during this same period, Congress affirmatively enacted a felon disenfranchisement statute in the District of Columbia, over which it had plenary power before the conferral of "home rule" in 1974. See Pub.L. No. 92-220, § 4, 85 Stat. 788, 788 (1971).[17] It is highly implausible that shortly after passing a statute (the VRA) purportedly intended to limit such laws, Congress would have enacted for its local jurisdiction a new statute doing exactly what it had supposedly forbidden on a national level.
 
 
 60
 The 1982 amendment of the Voting Rights Act also gives no indication that the law is to apply to felon disenfranchisement provisions. As noted, this amendment was enacted for the specific purpose of overruling the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). See S.Rep. No. 97-417, at 15-16 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 192-94; see also William N. Eskridge, Jr. et al., Cases and Materials on Legislation 149 (3d ed. 2001) ("The Bolden result in the Supreme Court triggered a firestorm of protest from civil rights advocates and Members of Congress. Hearings in 1981 were replete with testimony that the Court's decision was a departure from earlier Fifteenth Amendment precedents, as Justice Marshall had argued in dissent. A bipartisan coalition voted to amend the Voting Rights Act in 1982 to overrule, in effect, the Bolden decision."). Bolden had concluded that "racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation," Bolden, 446 U.S. at 62, 100 S.Ct. 1490, and held that "the language of § 2 [of the VRA] no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself." Id. at 60-61, 100 S.Ct. 1490. Congress's amendment of the VRA was thus intended to make clear that § 2 covered both vote denial and vote dilution and to reinstate the "results test," which had been the rule developed in the pre-Bolden case law. See, e.g., White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); S.Rep. No. 97-417, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. at 205 ("The `results' standard is meant to restore the pre-Mobile legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote. Specifically, subsection (b) embodies the test laid down by the Supreme Court in White.").
 
 
 61
 In light of this history, it is apparent that Congress's intention in amending § 1973 was to target those electoral laws, practices, and procedures that resulted in diluting the strength of the votes of members of racial and ethnic minorities but did not on their face deny any individuals the vote. See S.Rep. No. 97-417, at 19-24 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 196-202 (citing Supreme Court cases that addressed apportionment and reapportionment plans). The addition of § 1973(b) further demonstrates that Congress's particular focus was these vote-diluting practices. Section 1973(b) provides that a violation of the VRA can be established if "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class of citizens such that "its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). There is no question that incarcerated persons cannot "fully participate in the political process" — they cannot petition, protest, campaign, travel, freely associate, or raise funds. It follows that Congress did not have this subpopulation in mind when the VRA section at issue took its present form in 1982.[18]
 
 
 62
 We acknowledge that subsection (b) differs from subsection (a). See Chisom v. Roemer, 501 U.S. 380, 395, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) ("The two purposes of the amendment [to Section 2] are apparent from its text. Section (a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish any violation of the section. Section (b) provides guidance about how the results test is to be applied."). Nevertheless, the fact that the provision specifying how a claim is to be proved could not possibly apply to prisoners gives rise to greater doubt that Congress intended prisoners to be able to raise such a claim in the first place. We thus conclude that the amendment of subsection (a) to prohibit any "voting qualification or prerequisite to voting or standard, practice, or procedure that results in vote denial or vote dilution on account of race or color" was not contemplated or meant to include longstanding state felon disenfranchisement statutes, the existence and general validity of which were recognized both by the Fourteenth Amendment and in the legislative history of another section of the Voting Rights Act itself.[19]
 
 
 63
 Subsequent Congressional actions provide additional evidence that Congress has not understood the Voting Rights Act to cover felon disenfranchisement laws. For example, the National Voter Registration Act, enacted in 1993, explicitly provides for "criminal conviction" as a basis upon which voters' names may be removed from lists of eligible voters. See Pub.L. No. 103-31, 107 Stat. 77 (codified at 42 U.S.C. § 1973gg-6(a)(3)(B)). The Help America Vote Act of 2002 directs States to remove disenfranchised felons from their lists of those eligible to vote in federal elections. See Pub.L. No. 107-252, 116 Stat. 1666 (codified at 42 U.S.C. § 15483(a)(2)(A)(ii)(I)). Finally, a number of bills have been proposed in the past several years that would limit States' ability to disenfranchise felons. See Civic Participation and Rehabilitation Act, H.R. 259, 108th Cong. 2(a)-(c) (2003); Ex-Offenders Voting Rights Act of 2003, H.R. 1433, 108th Cong. (2003); Ex-Offenders Voting Rights Act of 2005, H.R. 663, 109th Cong. (2005); Count Every Vote Act of 2005, S. 450, 109th Cong. (2005). These bills further indicate that Congress itself continues to assume that the Voting Rights Act does not apply to felon disenfranchisement provisions.
 
 
 64
 In light of this wealth of persuasive evidence that Congress has never intended to extend the coverage of the Voting Rights Act to felon disenfranchisement provisions, we deem this one of the "`rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (alteration in original)); cf. Green v. Bock Laundry Mach. Co., 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in the judgment) ("I think it entirely appropriate to consult all public materials, including . . . the legislative history . . ., to verify that what seems to us an unthinkable disposition . . . was indeed unthought of, and thus to justify a departure from the ordinary meaning of the [statute's text]."). In such cases, the Court has made clear, "the intention of the drafters, rather than the strict language, controls." Ron Pair, 489 U.S. at 242, 109 S.Ct. 1026. As Judge Kozinski noted in his dissent from denial of rehearing en banc in the Ninth Circuit case, "[i]t's thus crystal clear that felon disenfranchisement wasn't one of the practices about which Congress was concerned. We are bound to respect that legislative judgment — not override it." Farrakhan, 359 F.3d at 1121. We accordingly construe the statute to not encompass felon disenfranchisement laws.[20]
 
 III.
 A. Clear Statement Rule
 
 65
 Our decision not to apply § 1973 to felon disenfranchisement provisions is confirmed and supported by the operation of the clear statement rule (also known as the "plain statement rule"), a canon of interpretation which requires Congress to make its intent "`unmistakably clear'" when enacting statutes that would alter the usual constitutional balance between the Federal Government and the States. Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)) (internal quotation marks omitted). Accordingly, to the extent that the Voting Rights Act would affect this balance if applied to felon disenfranchisement statutes, we must construe the statute not to encompass such provisions if it is even unclear whether Congress intended the Voting Rights Act to apply to such laws.
 
 
 66
 The clear statement rule provides that, "[i]f Congress intends to alter the `usual constitutional balance between the States and the Federal Government,' it must make its intention to do so `unmistakably clear in the language of the statute.'" Gregory, 501 U.S. at 460-61, 111 S.Ct. 2395 (quoting Atascadero, 473 U.S. at 242, 105 S.Ct. 3142) (internal quotation marks omitted). According to the Supreme Court, "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." Id. at 461, 111 S.Ct. 2395 (citations and internal quotation marks omitted) (emphasis added). Thus, we have stated that federal courts will construe a statute to alter the federal balance only when Congress expresses an "affirmative intention" to do so. DeMarco v. Holy Cross High Sch., 4 F.3d 166, 169 (2d Cir. 1993).
 
 
 67
 For the clear statement rule to apply here in defendants' favor, we would therefore need to conclude (1) that applying § 1973 to prisoner disenfranchisement laws would alter the constitutional balance between the States and the Federal Government and (2) that Congress has not made its intention to alter that balance unmistakably clear.
 
 
 68
 B. Threshold Question: Does the Clear Statement Rule Apply?
 
 
 69
 The threshold question to be confronted is whether the clear statement rule applies here at all. Plaintiffs forcefully argue that the clear statement rule only guides our statutory construction when the statutory language is ambiguous, relying on Gregory and post-Gregory decisions by the Supreme Court, and insist that the broad language of the Voting Rights Act is not ambiguous. We are not persuaded by plaintiffs' arguments.
 
 
 70
 The Gregory Court stated, in describing the operation of the clear statement rule, that "we must be absolutely certain that Congress intended such an exercise [of legislative power]," Gregory, 501 U.S. at 464, 111 S.Ct. 2395, and that "it must be plain to anyone reading the Act that it covers" the issue in question. Id. at 467, 111 S.Ct. 2395. Subsequent to Gregory, the Supreme Court, in BFP v. Resolution Trust Corp., formulated the analysis as follows: "[t]o displace traditional state regulation . . ., the federal statutory purpose must be `clear and manifest.'" 511 U.S. 531, 544, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)).
 
 
 71
 A few years later, the Supreme Court concluded that the clear statement rule did not apply in two cases. In 1997, in Salinas v. United States, the Court described Gregory as noting that "the principle it articulated did not apply when a statute was unambiguous." 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). The Court stated that "[t]he plain-statement requirement articulated in Gregory . . . does not warrant a departure from the statute's terms. The text of [the statute] is unambiguous on the point under consideration here . . . ." Id. The next term, the Court decided Pennsylvania Department of Corrections v. Yeskey, in which it assumed arguendo that the clear statement rule applied and held that "the requirement of the rule is amply met" because the statute was unambiguous. 524 U.S. 206, 209, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).[21]
 
 
 72
 These statements indicate that the clear statement rule does not require courts engaged in statutory interpretation to search for a construction of the statute that will not affect the federal balance, but rather, reveal the canon to be a default rule: when a particular construction of a statute would alter the federal balance, to the extent there is any doubt about whether Congress intended that construction, courts should assume that Congress did not mean to alter the federal balance. When the terms of a statute admit of no uncertainty, the statute, of course, serves as its own clear statement. In other words, a clear statement is only necessary when the statute does not itself constitute a clear statement on the relevant issue. Therefore, we will apply the clear statement rule when a statute admits of an interpretation that would alter the federal balance but there is reason to believe, either from the text of the statute, the context of its enactment, or its legislative history, that Congress may not have intended such an alteration of the federal balance.
 
 
 73
 The Court recently addressed the clear statement rule in a different context, but in terms that shed light on its operation here. Spector v. Norwegian Cruise Line, Ltd., 545 U.S. 119, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005). Discussing the "internal affairs" clear statement rule, which concerns "the presumption against applying general statutes to foreign vessels' internal affairs," id. at 2178, the plurality opinion noted that "[i]mplied limitation rules avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter," id. at 2182 (plurality opinion of Kennedy, J.)[22] (emphasis added), and that "[t]hese clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." Id. (emphasis added).
 
 
 74
 Though the Spector opinion nowhere cites the Gregory case, we note the striking similarity of the language used to describe the clear statement rule in these two areas, with both identifying the "sensitivity" of the area as the triggering condition for the clear statement rule. See Gregory, 501 U.S. at 461, 111 S.Ct. 2395 ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.") (citations and internal quotation marks omitted) (emphasis added). We thus read Spector as providing persuasive authority on the operation of the clear statement rule in the present context as well and as demonstrating that "broad or general language" — as the language of § 1973 might be described — does not necessarily constitute an unambiguous statement.
 
 
 75
 For the reasons discussed above, we believe Congress's intent regarding the coverage of felon disenfranchisement provisions by the Voting Rights Act is, at the very least, uncertain, despite the "broad and general language" used in that statute. Given the "sensitive topic" at issue, we would expect Congress to have specified that felon disenfranchisement provisions are covered by the Voting Rights Act if that were its intent. Inasmuch as Congress did not do so — and the evidence of Congressional intent suggests that Congress did not in fact intend to cover such provisions — we believe that the statute is sufficiently ambiguous for the clear statement rule to be applied here.
 
 C. Application of the Clear Statement Rule
 
 76
 In applying the clear statement rule, we must first decide whether bringing felon disenfranchisement laws within the scope of the Voting Rights Act — as plaintiffs ask us to do — would "alter the usual constitutional balance between the States and the Federal Government." Gregory, 501 U.S. at 460, 111 S.Ct. 2395 (internal quotation marks omitted). As a preliminary matter, plaintiffs argue that the application of the Voting Rights Act to felon disenfranchisement provisions could not affect the "federal balance" because that balance was already changed by the passage of the Fourteenth and Fifteenth Amendments, and the sole task of the Voting Rights Act is to effectuate those constitutional provisions. Consequently, plaintiffs assert that bringing their claim within the scope of the VRA would not alter the federal balance.
 
 
 77
 We do not find this argument persuasive, for, while it undoubtedly rings true for the Voting Rights Act in general, Section 2 of the Fourteenth Amendment explicitly leaves the federal balance intact with regard to felon disenfranchisement laws specifically. See U.S. Const. amend. XIV, § 2 ("[W]hen the right to vote at any [federal] election . . . is denied to any of the male inhabitants of [a] state . . . or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced. . . .") (emphasis added). Therefore, extending the coverage of the Voting Rights Act to these provisions would introduce a change in the federal balance not contemplated by the framers of the Fourteenth Amendment.
 
 
 78
 We have little difficulty concluding that application of the Voting Rights Act to prisoner disenfranchisement provisions like that of New York would effect a change in the federal balance. These laws, applying as they do only to currently incarcerated felons and parolees, implicate no less than three important state interests: (1) the regulation of the franchise; (2) the State's authority to craft its criminal law; and (3) the regulation of correctional institutions. We address each of these interests in turn.
 
 
 79
 There is no question that regulation of the franchise is an important state interest and that interfering with a State's power to govern this area would disrupt the federal balance. "No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices." Oregon v. Mitchell, 400 U.S. 112, 125, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Black, J.). In deciding that the Voting Rights Act did not apply to felon disenfranchisement provisions like that of Florida, the Eleventh Circuit drew an analogy to Gregory v. Ashcroft, which had addressed whether state judges could be subject to the provisions of the Americans with Disabilities Act and had concluded that "the authority of the people of the States to determine the qualifications of their most important government officials . . . lies at the heart of representative government." 501 U.S. at 463, 111 S.Ct. 2395. Judge Kravitch, writing for the Eleventh Circuit en banc, noted that "[i]f defining the qualifications of important government officials lies at the heart of representative government, then surely defining who decides what those qualifications will be is equally important." Johnson, 405 F.3d at 1232 n. 35. Indeed, as Judge Mahoney stated the last time we considered this question, "[t]he states have the primary responsibility for regulating the times, places, and manner of conducting federal elections, and even more obviously for regulating elections to state office." Baker, 85 F.3d at 931 (opinion of Mahoney, J.) (citation omitted). We agree with each of these formulations.
 
 
 80
 Second, the State of New York has made clear that its statute, § 5-106, constitutes an integral part of its criminal and penal systems. The New York statute, which formerly disenfranchised felons for life, was amended in 1971 to reach only currently incarcerated felons and parolees. See N.Y. Election Law § 5-106. The Bill Memorandum accompanying the amendment focused on the penal goals of the measure and justified the amendment by specifying that a primary concern of the penal system was "the rehabilitation of the offender" and that "[i]t is inconsistent with the general philosophy of corrections to continue punishment after a person has accounted." Bill Memorandum (Feb. 5, 1971), reprinted in Bill Jacket for ch. 310 (1971), at 3. The Model Penal Code likewise considers prisoner disenfranchisement provisions an integral part of the criminal law. See Model Penal Code § 306.3 (proposed official draft 1962). It is undisputed that "[u]nder our federal system, the States possess primary authority for defining and enforcing the criminal law." United States v. Lopez, 514 U.S. 549, 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (internal quotation marks omitted). The Supreme Court has acknowledged and restated on numerous occasions "the States' sovereign power to punish offenders." Engle v. Isaac, 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); see also, e.g., Calderon v. Thompson, 523 U.S. 538, 558, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (same); McCleskey v. Zant, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (same). Accordingly, applying the Voting Rights Act to prisoner disenfranchisement provisions would intrude on New York's "sovereign power to punish offenders" and would thus alter the federal balance.
 
 
 81
 Third, as a related yet distinct matter, the State has a powerful interest in the administration of its prisons. Indeed, "[o]ne of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task." Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)). The Supreme Court has gone so far as to say that "`[i]t is difficult to imagine an activity in which a State has a stronger interest.'" Yeskey, 524 U.S. at 209, 118 S.Ct. 1952 (quoting Preiser v. Rodriguez, 411 U.S. 475, 491, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Inasmuch as New York's prisoner disenfranchisement provision is limited to those confined in penal institutions and on parole, applying the Voting Rights Act to the provision would surely affect the State's powers in this area as well.
 
 
 82
 In light of these three separate compelling state interests, we have little difficulty concluding that construing the VRA to encompass prisoner disenfranchisement provisions like that of New York would unquestionably alter the federal balance.[23] Accordingly, we proceed to the second prong of the clear statement test, which requires us to determine whether Congress has clearly signaled its intent to alter the federal balance by subjecting state prisoner disenfranchisement laws to the provisions of the Voting Rights Act.
 
 
 83
 D. Has Congress Made A Clear Statement?
 
 
 84
 As discussed at greater length above, our review of the legislative history of both the 1965 enactment and 1982 revision of the Voting Rights Act as well as our examination of other proposed legislation on this issue demonstrate Congress's lack of intent to include felon disenfranchisement provisions in the coverage of the Voting Rights Act, and compel us to conclude that Congress unquestionably did not manifest an "unmistakably clear" intent to include felon disenfranchisement laws under the VRA. As a result, we hold that the requirements of the clear statement rule are not met, and we will accordingly not construe the Voting Rights Act to reach these laws.
 
 
 85
 * * *
 
 
 86
 We therefore hold that the Voting Rights Act must be construed to not encompass prisoner disenfranchisement provisions like that of New York because (a) Congress did not intend the Voting Rights Act to cover such provisions; and (b) Congress made no clear statement of an intent to modify the federal balance by applying the Voting Rights Act to these provisions. Accordingly, we conclude that plaintiffs' vote denial claim, which seeks to challenge New York's prisoner disenfranchisement statute under the Voting Rights Act, must be dismissed and the judgment of the District Court must be affirmed.[24]
 
 IV.
 Vote Dilution Claim
 
 87
 As noted above, plaintiffs have also raised a vote dilution claim based on "the disproportionate disfranchisement under New York State Election Law § 5-106(2) of Black and Latino persons who are incarcerated or on parole for a felony conviction." In light of our conclusion that the Voting Rights Act does not encompass felon disenfranchisement provisions and that plaintiffs thus cannot state a vote denial claim under the statute, it is clear that plaintiffs also cannot state a claim for vote dilution based on the assertion that the denial of the vote to incarcerated felons and parolees dilutes the voting strength of minority communities. Accordingly, this claim is likewise dismissed, and the judgment of the District Court is affirmed.
 
 
 88
 It is unclear whether plaintiffs' vote dilution claim also encompasses a claim on behalf of plaintiffs who are neither incarcerated nor on parole, that their votes are "diluted" because of New York's apportionment process, see N.Y. Const. art. III, § 4, which counts incarcerated prisoners as residents of the communities in which they are incarcerated, and has the alleged effect of increasing upstate New York regions' populations at the expense of New York City's.[25] Plaintiffs' complaint does not raise this claim explicitly, though it is briefly alluded to in their submissions before this Court. See Plaintiffs' Compl. ¶ 93 ("§ 5-106(2) of New York Election Law serves to dilute the voting strength of Blacks and Latinos and certain minority communities in New York State . . . in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973."); Pet'rs' Br., at 37-38 ("New York State's policy and practice of using Census Bureau data for Congressional, state legislative, and certain municipal redistricting whereby prisoners' residence is assigned to their prison rather than to the prisoners' home address distorts the principle of `one person, one vote' and dilutes the voting strength of prisoners' home communities . . . ."). Inasmuch as this question was neither considered by the District Court nor briefed by defendants, we intimate no view on the question and remand to the District Court to consider whether plaintiffs have indeed properly raised the claim, and, if so, to rule on the merits of the claim.
 
 Conclusion
 
 89
 For the reasons stated above, we conclude that the Voting Rights Act must be construed to not encompass prisoner disenfranchisement provisions such as that of New York because (a) Congress did not intend the Voting Rights Act to cover such provisions; and (b) Congress made no clear statement of an intent to modify the federal balance by applying the Voting Rights Act to these provisions. Accordingly, we dismiss plaintiffs' Voting Rights Act claims challenging New York Election Law § 5-106.
 
 
 90
 The judgment of the District Court is AFFIRMED and the cause is remanded to the District Court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Senior Circuit Judges Thomas J. Meskill and Richard J. Cardamone were part of theMuntaqim en banc court because they were on the three-judge panel that originally heard the case. See 28 U.S.C. § 46(c). They were not on the Hayden en banc court. Because we have vacated the panel decision in Muntaqim on jurisdictional grounds, Judges Meskill and Cardamone have played no role in the decision of this matter.
 
 
 [2]
 TheHayden plaintiffs raise a number of other constitutional and statutory claims, which are not before the en banc court and which will be considered by a three-judge panel in the normal course.
 
 
 [3]
 Because it dismissed all of plaintiffs' claims on the merits, the District Court denied plaintiffs' motion for class certification as mootHayden, 2004 WL 1335921, at *8 n. 5, 2004 U.S. Dist LEXIS 10863, at *24 n. 5.
 
 
 [4]
 New York Election Law § 5-106(2)-(5) states:
 
 
 [2]
 No person who has been convicted of a felony pursuant to the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the governor, or his maximum sentence of imprisonment has expired, or he has been discharged from parole. The governor, however, may attach as a condition to any such pardon a provision that any such person shall not have the right of suffrage until it shall have been separately restored to him
 
 
 [3]
 No person who has been convicted in a federal court, of a felony, or a crime or offense which would constitute a felony under the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the president of the United States, or his maximum sentence of imprisonment has expired, or he has been discharged from parole
 
 
 [4]
 No person who has been convicted in another state for a crime or offense which would constitute a felony under the laws of this state shall have the right to register for or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his maximum sentence has expired, or he has been discharged from parole
 
 
 [5]
 The provisions of subdivisions two, three and four of this section shall not apply if the person so convicted is not sentenced to either death or imprisonment, or if the execution of a sentence of imprisonment is suspended
 
 
 [5]
 Although § 5-106 disenfranchises felons on parole as well as incarcerated felons, for ease of reference we refer to the class of felons disenfranchised by § 5-106 as "incarcerated felons."Cf. Dixon v. Miller, 293 F.3d 74, 78 (2d Cir.2002) (noting that a convict released on parole is still treated for habeas purposes as if he were "in custody") (quoting Jones v. Cunningham, 371 U.S. 236, 242-43, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)).
 
 
 [6]
 Before its amendment in 1982, § 1973 provided: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."City of Mobile v. Bolden, 446 U.S. 55, 60, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).
 
 
 [7]
 As we note below, the New York provision at issue here is considerably narrower in its reach than those of Florida and Washington, at issue inJohnson and Farrakhan, respectively. In referring generally to statutes that deny the franchise to felons (during and after incarceration and parole), we will refer to "felon disenfranchisement statutes"; in referring to New York's narrower version of the species, we refer to its "prisoner disenfranchisement statute."
 
 
 [8]
 We note that, despite plaintiffs' claim that racial discrimination infects the whole of the criminal justice system such that non-racially motivated felon disenfranchisement laws violate the VRA, counsel for plaintiffs insisted at oral argument that they do not allege any discrimination in plaintiffs' particular convictions. They did well not to make this claim, for such an assertion might have raised questions under the doctrine ofHeck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), which provides that "[i]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87, 114 S.Ct. 2364. Here, clearly, none of the plaintiffs could make this showing.
 
 
 [9]
 Judge Parker's dissent emphasizes that because defendants prevailed below on a motion for judgment on the pleadings and because "[t]here is no substantive record in this case," "[n]one of us knows what reality — if any — exists behind these allegations." Dissent of Judge Parker at 344. The dissent further underscores that "each of the other circuits that has wrestled with this issue has done so on the basis of a fully-developed summary judgment record, not simply on the pleadings."Id. at 344. These observations have no bearing on the question whether Congress intended the Voting Rights Act to encompass prisoner disenfranchisement statutes such as the one at issue here. Accordingly, notwithstanding the dissent's effort to construct a hypothetical record based on its own suppositions about what is or is not "beyond the realm of possibility in New York," id. at 345, we focus on the question of statutory interpretation presented.
 
 
 [10]
 Contrary to the suggestion of our colleagues in dissent, we do not rely on the Fourteenth Amendment for the proposition that felon disenfranchisement statutes are "always constitutional" or somehow "immune from congressional regulation." Dissent of Judge Parker, at 345. Nor do we suggest that the Voting Rights Act was enacted pursuant to Congress's power under the Fourteenth Amendment, rather than the Fifteenth AmendmentCf. Dissent of Judge Parker at 350 ("The majority fails to appreciate that the operative provisions of the VRA were enacted pursuant to Congress's power under the Fifteenth Amendment."). Instead, our inquiry into Congressional intent is simply informed by the historic nature of felon disenfranchisement statutes and by the Fourteenth Amendment's explicit approval of such laws.
 
 
 [11]
 The Fourteenth Amendment, as interpreted by the Supreme Court, does not completely insulate felon disenfranchisement provisions from constitutional scrutiny. It is clear, for example, that if a State disenfranchises felons "with the intent of disenfranchising blacks," that State has run afoul of Section 1 of the Fourteenth AmendmentSee Hunter v. Underwood, 471 U.S. 222, 229, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (invalidating disenfranchisement provision of Alabama Constitution passed with discriminatory intent). Our conclusion that § 1973 does not encompass prisoner disenfranchisement laws such as that of New York thus does not mean that there is no remedy for laws of this type that were passed with the intent to disenfranchise members of minority groups, as these laws are already unconstitutional under the Fourteenth Amendment.
 
 
 [12]
 Va. Const. Art. 3, § 1 (1776); Ky. Const. Art. 8, § 8 (1799); Ohio Const. Art. 4, § 4 (1802); La. Const. Art. 6, § 4 (1812); Ind. Const. Art. 6, § 4 (1816); Miss. Const. Art. 6, § 5 (1817); Conn. Const. Art. 6, § 2 (1818); Ill. Const. Art. 2, § 30 (1818); Ala. Const. Art. 6, § 5 (1819); Mo. Const. Art. 3, § 14 (1820); N.Y. Const. Art. 2, § 2 (1821); Del. Const. Art. 4, § 1 (1831); Tenn. Const. Art. 4, § 2 (1834); Fla. Const. Art. 6, § 4 (1838); R.I. Const. Art. 2, § 4 (1842); N.J. Const. Art. 2, § 1 (1844); Tex. Const. Art. 7, § 4 (1845); Iowa Const. Art. 2, § 5 (1846); Wise. Const. Art. 3, § 2 (1848); Calif. Const. Art. 2, § 5 (1849); Md. Const. Art. 1, § 5 (1851); Minn. Const. Art. 7, § 2 (1857); Ore. Const. Art. 2, § 3 (1857); Kan. Const. Art. 5, § 2 (1859); W.Va. Const. Art. 3, § 1 (1863); Nev. Const. Art. 2, § 1 (1864); S.C. Const. Art. 4, § 1 (1865); Ga. Const. Art. 2, § 6 (1868); N.C. Const. Art. 6, § 5 (1868) (cited inGreen, 380 F.2d at 450 nn. 4-5).
 
 
 [13]
 Our dissenting colleagues dismiss our analysis of the historical origins of felon disenfranchisement statutes as mere "[h]istorical anecdotes," Dissent of Judge Parker at 355, likening such statutes to other longstanding voting qualifications such as literacy tests and poll taxes. Yet we do not suggest that felon disenfranchisement laws fall outside the scope of the Voting Rights Act simply because they are deeply rooted in American history and in the Western tradition more broadly. Rather, we argue that it is unlikely that Congress would have invalidated such laws — which have been widely-used since the origins of the Republic — without any discussion of the matter
 By contrast, section 4(c) of the Voting Rights Act explicitly prohibits literacy tests by defining the statutory term "[t]est or device" to mean "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 42 U.S.C. § 1973b(c). As noted, this provision specifically exempts felon disenfranchisement provisions.
 Likewise, in 1964, a year prior to Congress's passage of the Voting Rights Act, poll taxes had been expressly forbidden by the 24th Amendment, which provides, in relevant part, that "[t]he right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1.
 The explicit treatment, either in the Voting Rights Act or in the Constitution, of other similarly longstanding and widely-practiced voting qualifications only serves to confirm our view that Congress did not amend the Voting Rights Act in a way that brought felon disenfranchisement laws within its purview.
 
 
 [14]
 Our dissenting colleagues acknowledge that Committee Reports such as these "`represent[] the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.'" Dissent of Judge Parker, at 354 (quotingZuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)).
 
 
 [15]
 In criticizing our reference to this statement by Senator Tydings — the only floor statement to which we cite — the dissent quotes selectively from volume 2A of "Sutherland Statutory Construction § 48.13." In fact, the authority on which the dissent relies concludes:
 Now the federal courts hold that statements by any members during legislative debates may be considered in the interpretation of a statute where they show a common agreement in the legislature about the meaning of an ambiguous provision. Statements made by individual legislators during floor debates are also considered, along with information about contemporary conditions and events, when they establish what problems or evils the legislature was trying to remedy.
 2A C. Sands, Sutherland Statutory Construction § 48.13 at 356 (5th ed.1992).
 
 
 [16]
 An example of the viewpoint of proponents of the legislation was offered by John A. Buggs, the Staff Director of the U.S. Commission on Civil Rights, at the hearing on H.R. 9020. Mr. Buggs stated:
 We support H.R. 9020 because the denial of the right to vote to citizens who have been convicted of a criminal offense remains as one of the last major obstacles to the full enjoyment of that right by all citizens of the United States. Through passage of constitutional amendments subsequently ratified by the States, Congress has eliminated voter qualifications based on race, sex, and wealth and has extended the right to vote to all citizens 18 years old or older. Through passage of the Voting Rights Act of 1965 and the Voting Rights Amendments of 1970 the Congress has enacted legislation whose objective is the enforcement of these constitutionally protected rights. It is now most appropriate for Congress to and the denial of the right to vote to former criminal offenders.
 Ex-Offenders Voting Rights: Hearing on H.R. 9020 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 93d Cong. 10 (1974) (remarks of John A. Buggs, Staff Director, U.S. Commission on Civil Rights) (emphasis added). These remarks, and those of other proponents of H.R. 9020, leave no doubt of the general understanding that the Voting Rights Act did not encompass felon disenfranchisement laws, and the course of the hearings indicates that the Subcommittee shared this understanding.
 
 
 [17]
 After the enactment of home rule legislation for the District of Columbia in 1974, which gave the D.C. Council plenary powers, subject to Congressional review,see D.C.Code Ann. § 1-207.52, § 1-206.02(c)(1), the D.C. Council revised the election code to disenfranchise only prisoners, rather than felons who had completed their sentences. Id. §§ 1-1001.02(7)(A)-(B); 1-1001.07(k)(1), (3)-(4).
 
 
 [18]
 In his separate dissent, Judge Calabresi concedes that the Voting Rights Act did not erect "aper se ban on felon disenfranchisement," but insists that "[n]othing in the majority opinion . . . gives a single reason to suggest that Congress did not intend the Voting Rights Act to do what its plain language says and bar felon disenfranchisement statutes that result in racial discrimination." Dissent of Judge Calabresi, at 363-64 (emphasis in original). Our argument cannot be reduced, however, to the assertion that the 1982 Congress could not have intended to expand the Voting Rights Act to encompass felon disenfranchisement provisions simply because, in 1965, § 4(c) of the Voting Rights Act included no categorical ban on felon disenfranchisement statutes, or because more recent congressional actions presuppose the general validity of felon disenfranchisement statutes. Rather, taking account of the long-standing acceptance of felon disenfranchisement laws and the fact that Congress's only recorded decisions respecting such laws in the context of the Voting Rights Act were designed to assuage concerns about their continued vitality, we conclude that Congress could not have intended in 1982 to authorize challenges to such laws on the basis that they "result in racial discrimination" without some more specific indication to that effect. See note 19, post. Indeed, in light of the historic treatment of such laws discussed above, Judge Calabresi's analogy to at-large districts, which are neither constitutionally sanctioned nor explicitly excluded from a separate section of the Act, is entirely inapposite.
 
 
 [19]
 In this regard, we note that the 1982 revisions focused only on the means of proving a violation — changing subsection (a) from "to deny or abridge the right of any citizen of the United States to vote on account of race or color" to "in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" and adding subsection (b). The 1982 revisions did not address the first part of subsection (a), dealing with the voting provisions subject to the Act, and there is no basis upon which we could conclude that the intent of the 1982 Congress with regard to coverage was any different than that of the 1965 Congress
 
 
 [20]
 Our dissenting colleagues oversimplify matters when they argue that "[T]o hold that Congress did not intend the VRA to cover felon disenfranchisement statutes is to hold that Congress actually intended to allow some forms of race-based voter disenfranchisement." Dissent of Judge Parker at 357. Congress's decision not to extend the Voting Rights Act to felon disenfranchisement statutes can surely not be construed as Congress's intent to permit "race-based voter disenfranchisement." First, by the dissent's own admission, it remains unproven whether felon disenfranchisement statutes indeed constitute "race-based voter disenfranchisement" in New York. Second, felon disenfranchisement statutes, while exempt from the reach of the VRA, may still be subject to Fourteenth Amendment challengeSee note 11, ante.
 
 
 [21]
 Plaintiffs argue thatYeskey governs this case, as the Court, in addressing whether the Americans with Disabilities Act ("ADA") covers inmates in state prisons, noted there that "the ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." Yeskey, 524 U.S. at 209, 118 S.Ct. 1952. As such, the Court concluded that the general language of the ADA constituted a sufficiently clear statement of Congress's intent for the purposes of the clear statement rule.
 We believe Yeskey is easily distinguishable from this case. There was no reason to believe that Congress, in enacting the ADA, had given any thought whatsoever to the coverage of prisons. In light of the broad language of the ADA, and the absence of any exception from its coverage of state institutions, there was no basis on which to conclude that Congress had meant to exempt prisons. The present situation is substantially different. Here, for the reasons stated at length above, there is a significant amount of evidence that Congress did not intend the VRA to encompass felon disenfranchisement laws, and, at the very least, was convinced it had not done so. Accordingly, the broad language of the VRA notwithstanding, it is not entirely clear that Congress meant to alter the federal balance by encompassing felon disenfranchisement laws within the coverage of the VRA, and the clear statement rule must therefore be applied.
 
 
 [22]
 This part of Justice Kennedy's opinion for the Court was joined by Justices Stevens, Souter, and Thomas
 
 
 [23]
 By contrast with New York's prisoner disenfranchisement provision, felon disenfranchisement provisions like that of Florida, which permanently denies the vote to those convicted of felonies, may not as clearly implicate the State's interest in the administration of prisons. We express no opinion on the legal implications, if any, that follow from this difference
 
 
 [24]
 Because we conclude that the Voting Rights Act should not be construed to apply to prisoner disenfranchisement provisions like that of New York, we need not address the constitutional avoidance canon relied upon by the Eleventh Circuit in its decision inJohnson. We express no view on whether applying the protections of the Voting Rights Act to prisoner disenfranchisement provisions gives rise to any constitutional difficulties under the Fourteenth or Fifteenth Amendments.
 
 
 [25]
 The United States Census Bureau counts inmates of correctional institutions as residents of the institution, and notes the "usual residence" at which it counts people "is not necessarily the same as the person's voting residence or legal residence." U.S. Census Bureau,Plans and Rules for Taking the Census, at §§ 2, 11, available at http://www.census.gov/population/www/censusdata/resid_rules.html (last viewed Sept. 26, 2005); see also Dist. of Columbia v. United States Dept. of Commerce, 789 F.Supp. 1179, 1180 (D.D.C.1992).
 
 
 
 91
 JOHN M. WALKER, JR., Chief Judge, concurring, with whom Judge Jacobs joins.
 
 
 92
 As the majority fully explains, Congress never intended the Voting Rights Act ("VRA") to reach felon-disenfranchisement statutes. And even if, as the dissent argues, the plain language of the statute by its terms covers New York Election Law Section 5-106 ("Section 5-106"), this case presents the "rare and exceptional circumstance" where the plain meaning of a statute does not dictate the congressional intent nor the proper outcome. Ardestani v. INS, 502 U.S. 129, 135-36, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); see also United States v. Ron Pair Enters., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (noting that, when the legislative intent and the plain meaning of a statute contradict, "the intention of the drafter, rather than the strict language, controls"); Griffin v. Oceanic Contractors Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.").
 
 
 93
 Finally, even if Section 2 of the VRA applies to Section 5-106 and no contrary congressional intent were evident, then I believe that, as applied, the VRA would be unconstitutional because Congress would have exceeded its enforcement power under the Reconstruction Amendments. As the majority demonstrates, the case can be resolved without reaching this issue, but I believe it provides yet another sound basis for rejecting the dissent's position.
 
 
 94
 In a recent series of cases, the Supreme Court has delineated the scope of Congress's enforcement power under the Reconstruction Amendments.[1] These cases teach that Congress is not confined to enacting prohibitions against activity proscribed by the Amendments themselves but also "may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 727-28, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); accord Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); City of Boerne v. Flores, 521 U.S. 507, 517-18, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); Katzenbach v. Morgan, 384 U.S. 641, 658, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). However, Congress's power in this area has limits. Any prophylactic legislation must be an "appropriate remedy for identified constitutional violations, not `an attempt to substantively redefine the States' legal obligations.'" Hibbs, 538 U.S. at 728, 123 S.Ct. 1972 (quoting Kimel, 528 U.S. at 88, 120 S.Ct. 631); Boerne, 521 U.S. at 519, 117 S.Ct. 2157. Determining whether prophylactic legislation is authorized involves three steps: A court first must define "with some precision" the scope of the constitutional right that Congress seeks to enforce, Garrett, 531 U.S. at 365, 121 S.Ct. 955; then the court looks at "whether Congress identified a history and pattern" of unconstitutional violations of that right,[2] id. at 367, 121 S.Ct. 955; and finally, the court must assess the means Congress has chosen to address these violations to determine whether its remedy is a congruent and proportional response to those violations, see Hibbs, 538 U.S. at 728, 123 S.Ct. 1972 (quoting Boerne, 521 U.S. at 520, 117 S.Ct. 2157).
 
 
 95
 Here, the right that the VRA was enacted to promote is the constitutional prohibition on racial discrimination in voting regulations. It is in the second step of the Court's test that the constitutionality of the VRA, if applied to Section 5-106,[3] founders. There is, quite simply, no evidence in the record before Congress of a history and pattern of invidious felon disenfranchisement by the states.
 
 
 96
 Only in cases where Congress can point to evidence in the legislative record that establishes a pattern of unconstitutional discrimination involving the particular practices proscribed by the remedial scheme at issue has the Supreme Court upheld legislation as within Congress's enforcement power under the Reconstruction Amendments. For example, in Hibbs, the constitutionality of a provision allowing employees to sue the states for violations of the Family Medical Leave Act ("FMLA") turned on whether the legislative record revealed evidence of a pattern of constitutional violations by the states. 538 U.S. at 729, 123 S.Ct. 1972. This record, consisting of labor surveys and testimony at congressional hearings, showed that state employers' leave policies discriminated between men and women on the basis of gender stereotypes. 538 U.S. at 730-31 & nn. 3-5, 123 S.Ct. 1972. Because Congress made extensive and detailed findings that, when the FMLA was enacted, "States relied on invalid gender stereotypes in the employment context, specifically in the administration of leave benefits," 538 U.S. at 735 n. 11, 123 S.Ct. 1972 (internal quotation and alteration marks omitted), the Court upheld the FMLA as a valid exercise of Congress's Section 5 power. Id. at 740, 123 S.Ct. 1972.
 
 
 97
 In Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), the Court upheld the application of Title II of the Americans with Disabilities Act of 1990 ("ADA") to the access to state courthouses on a similar basis. The ADA's legislative history includes the results of 13 congressional hearings and the findings of a special task force that gathered evidence from all 50 states. 541 U.S. at 516, 124 S.Ct. 1978. This extensive record revealed pervasive state laws discriminating against the disabled, id. at 524, 124 S.Ct. 1978, "hundreds of examples of unequal treatment of persons with disabilities by States," id. at 526, 124 S.Ct. 1978, the widespread inaccessibility of public services to those with disabilities, id. at 527, 124 S.Ct. 1978, and "numerous examples of the exclusion of persons with disabilities from state judicial services and programs," id. These findings constituted specific evidence that "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." Id. This record evidence before Congress enabled the Court to hold that applying the ADA to require access to courthouses was a constitutional exercise of Congress's Section 5 powers. Id. at 533-34, 124 S.Ct. 1978.
 
 
 98
 In both Hibbs and Lane, the Supreme Court was not satisfied simply with evidence of gender discrimination or disability discrimination generally. Prophylactic legislation, to be legitimate, must be supported by record evidence that demonstrates a pattern of pervasive discrimination in the particular area in which Congress is attempting to legislate. So in Hibbs, the necessary evidence was not a widespread pattern of gender discrimination; it was a widespread pattern of gender discrimination in the administration of leave benefits. Hibbs, 538 U.S. at 735 n. 11, 123 S.Ct. 1972. And in Lane, the requisite evidence showed a pattern of discrimination against the disabled specifically in the provision of public services, including access to court proceedings. Lane, 541 U.S. at 527, 124 S.Ct. 1978.
 
 
 99
 In contrast, the Court has struck down federal legislation unsupported by evidence identifying a pattern of specific unconstitutional state action to be remedied. In Boerne, the Court held that Congress exceeded its Section 5 powers under the Fourteenth Amendment in enacting the Religious Freedom Restoration Act of 1993 ("RFRA") because "RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." Boerne, 521 U.S. at 530, 117 S.Ct. 2157. Similarly, in Kimel, finding that "Congress never identified any pattern of age discrimination by the States much less any discrimination whatsoever that rose to the level of constitutional violation," the Court held the Age Discrimination in Employment Act of 1967 ("ADEA") unconstitutional as applied to the states, terming it "an unwarranted response to a perhaps inconsequential problem." Kimel, 528 U.S. at 89, 120 S.Ct. 631. And Garrett held that Title I of the ADA was an invalid exercise of Congress's Section 5 powers because "[t]he legislative record of the ADA . . . simply fail[ed] to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." Garrett, 531 U.S at 368, 121 S.Ct. 955. Garrett acknowledged some anecdotal evidence of constitutional violations, id. at 370, 121 S.Ct. 955; however, "these incidents taken together [fell] far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based," id. at 370, 121 S.Ct. 955. See also Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank, 527 U.S. 627, 640, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (noting that Congress could not abrogate state sovereign immunity under its Section 5 powers via the Patent Remedy Act because "Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations").[4]
 
 
 100
 The VRA is plainly intended to prohibit not only intentional discrimination but also measures that have discriminatory effects. E.g., 42 U.S.C. § 1973(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed . . . in a manner which results in a denial or abridgement of the right . . . to vote . . . .") (emphasis added). But although the VRA reaches much state action that has discriminatory effects on minority voting, it does not encompass all such action. As the precedents above make plain, it can serve to invalidate measures with disparate racial impact only if there is evidence in the congressional record that those measures are part of a history and practice of unconstitutional intentional discrimination. See, e.g., Oregon v. Mitchell, 400 U.S. 112, 117-18, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (upholding the VRA's prohibition on literacy tests but invalidating the provision authorizing 18-year-olds to vote in state and local elections).
 
 
 101
 Many of the VRA's prophylactic provisions do respond to record evidence of specific unconstitutional discrimination, and the Supreme Court has upheld them. For example, in upholding the VRA's suspension of literacy tests, the Court noted that, despite the fact that literacy tests are not in themselves violations of the Fifteenth Amendment, "the record shows that in most of the States covered by the Act . . . various tests and devices have been instituted with the purpose of disenfranchising Negroes." South Carolina v. Katzenbach, 383 U.S. 301, 333-34, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Similarly, in enacting Section 5 of the VRA, which requires certain jurisdictions to acquire federal approval of any changes in their voting laws, "Congress began work with reliable evidence of actual voting discrimination in a great majority of the States" covered by this requirement, thus justifying the application of that provision to those geographical areas. Id. at 329, 86 S.Ct. 803. And in amending Section 2 to clarify that practices that result in diluting the strength of minority votes are covered by the Act, see S.Rep. No. 97-417, at 19-24 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 196-201, Congress relied on evidence that specific practices, such as the use of at-large districts and majority voting requirements, perpetuated the effects of past intentional discrimination, id. at 7-10, 36-40, 1982 U.S.C.C.A.N. at 183-187, 214-218. Application of the VRA to these practices, which were facially constitutional but found to be tools of intentional discrimination against minorities, has been held to be an appropriately congruent and proportional exercise of Congress's enforcement powers under the Reconstruction Amendments.[5]
 
 
 102
 In contrast to those practices targeted by the VRA, no basis exists to conclude that felon-disenfranchisement statutes such as New York's are part of the history and pattern of unconstitutional discrimination that the VRA was targeting. Nowhere does the legislative record, compiled when the VRA was enacted in 1965, suggest that felon-disenfranchisement provisions were part of this country's history of intentional discrimination in voting. To the contrary, the legislative record of the VRA and the history of felon-disenfranchisement provisions indicate that they played no part in the "unremitting and ingenious defiance," South Carolina v. Katzenbach, 383 U.S. at 309, 86 S.Ct. 803, of the extension of the franchise to racial minorities.
 
 
 103
 With the exception of a debate regarding Section 4(c) of the VRA, the legislative record is wholly silent on the subject of felon-disenfranchisement provisions, and that lone debate plainly expressed the intent to exclude such provisions from the reach of the statute. As the majority points out, because felon-disenfranchisement statutes are blanket prohibitions and not subject to discretionary enforcement, they do not lend themselves to the discriminatory abuse characteristic of other voter qualification devices. See Maj. Op. at 319, supra. Indeed, New York and many other states enacted and enforced such laws in the early years of the Republic, well before African Americans were part of the voting population. See id. at 316-17, supra. Disenfranchisement for the commission of a crime was fully accepted as a legitimate, constitutional practice at the time the Fourteenth Amendment was drafted and ratified, see id., supra, as reflected in the express reference to felon disenfranchisement in Section 2 of the Fourteenth Amendment. U.S. Const. amend. XIV, § 2; see Richardson v. Ramirez, 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) ("We hold that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of § 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise which have been held invalid under the Equal Protection Clause by this Court.").
 
 
 104
 Nor can the necessary evidentiary record be found at the time Congress amended Section 2 of the VRA in 1982. That legislative record reflects Congress's focus on overruling the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), to allow the VRA to reach vote-dilution practices such as at-large elections. S.Rep. No. 97-417, at 19-24 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 196-201; see Maj. Op. at 313, 321-22, supra. The 1982 legislative record does not even mention felon-disenfranchisement statutes, much less point to any evidence that these laws were used (either nationally or specifically in New York) as part of a history and pattern of unconstitutional discrimination.
 
 
 105
 This is not to say that there have not been isolated incidents of criminal-disenfranchisement laws being used invidiously. In Hunter v. Underwood, the Supreme Court struck down a provision of the Alabama Constitution that, among other things, disenfranchised persons convicted of crimes involving "moral turpitude" as determined at the discretion of the Boards of Registrars. 471 U.S. 222, 226, 229-30, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). Though facially race-neutral, the Court found that provision to have been adopted to intentionally disenfranchise African Americans. Id. Significantly, Hunter did not disturb the Alabama disenfranchisement provision as it applied to felons. See id. at 225, 105 S.Ct. 1916. Similarly, the portion of the Mississippi Constitution at issue in Williams v. Mississippi disenfranchised citizens who had committed specific felonies thought to be committed disproportionately by African Americans. 170 U.S. 213, 222, 225 n. 1, 18 S.Ct. 583, 42 L.Ed. 1012 (1898); see also Cotton v. Fordice, 157 F.3d 388, 391 (5th Cir.1998) (stating that Section 241 of the Mississippi Constitution was unconstitutionally discriminatory when first adopted but subsequent amendments and reenactments for nondiscriminatory purposes cured it of its "odious origin"). Notably, the provisions in these cases did not apply to all criminals but were confined to those who had committed only those crimes "believed . . . to be more frequently committed by blacks." Hunter, 471 U.S. at 226-27, 105 S.Ct. 1916. Such selective and discretionary disenfranchisement is much more likely to be applied in a discriminatory manner than blanket provisions that bar all felons from the voting rolls. Measures enacted or administered with discriminatory intent remain unconstitutional and will be struck down when they are found. But as the Court pointed out in Garrett, isolated anecdotal evidence of discrimination is insufficient to support the exercise of Congress's Section 5 power. Garrett, 531 U.S. at 370, 121 S.Ct. 955. Moreover, the plaintiffs' success in Hunter indicates that whenever an isolated instance of unconstitutional criminal disenfranchisement occurs, it can be addressed under existing law. Isolated occurrences here and there do not provide a basis for invalidating all felon-disenfranchisement statutes nationwide.
 
 
 106
 Applying the VRA to New York's felon-disenfranchisement statute also runs afoul of the third part of the Supreme Court's test: even where the record establishes a history and pattern of constitutional violations, there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Boerne, 521 U.S. at 520, 117 S.Ct. 2157. To ensure congruence and proportionality, Section 5 enforcement measures frequently include geographic restrictions, sunset dates, or other limiting provisions. Boerne, 521 U.S. at 533, 117 S.Ct. 2157. Only statutes with these limitations in scope, specifically targeted to remedy identified patterns of constitutional violations, have been determined to be appropriately congruent and proportional. For example, most provisions in the VRA itself were carefully crafted to address the particular set of voting violations that Congress identified. See Garrett, 531 U.S. at 373, 121 S.Ct. 955 ("[B]efore enacting [the VRA], Congress explored with great care the problem of racial discrimination in voting" and created "a detailed but limited remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment in those areas of the Nation where abundant exercise of States' systematic denial of those rights was identified.") (quotation marks omitted); see also Lane, 541 U.S. at 531-32, 124 S.Ct. 1978 ("The remedy Congress chose is . . . a limited one . . . . It requires only `reasonable modifications . . . .'"); Hibbs, 538 U.S. at 738-39, 123 S.Ct. 1972 ("[T]he FMLA is narrowly targeted at the fault-line between work and family — precisely where sex-based overgeneralization has been and remains strongest — and affects only one aspect of the employment relationship . . . . We also find significant the many other limitations that Congress placed on the scope of this measure.").
 
 
 107
 Because the application of the VRA to felon-disenfranchisement statutes would not be a response to specific, identified, unconstitutional wrongdoing, it cannot be congruent and proportional.[6] Legislation unsupported by a record indicating the need for remedial measures consistently has been held to be "so out of proportion to a supposed remedial or preventive object that it cannot not be understood as responsive to . . . unconstitutional behavior." E.g., Boerne, 521 U.S. at 532, 117 S.Ct. 2157; Kimel, 528 U.S. at 91, 120 S.Ct. 631; Garrett, 531 U.S. at 372, 121 S.Ct. 955; see also United States v. Morrison, 529 U.S. 598, 626-28, 120 S.Ct. 1740, 146 L.Ed.2d 658 ("Congress'[s] findings indicate that the problem of discrimination against the victims of gender-motivated crimes does not exist in all States, or even most States. By contrast, the § 5 remedy upheld in Katzenbach v. Morgan was directed only to the State where the evil found by Congress existed, and in South Carolina v. Katzenbach, the remedy was directed only to those States in which Congress found that there had been discrimination.") (internal citations omitted). Such statutes overstep Congress's power by attempting to rewrite the substantive provisions of the Constitution. See Boerne, 521 U.S. at 508, 117 S.Ct. 2157. Thus the application of Section 2 of the VRA to Section 5-106, in the absence of any evidence of a history or pattern of discrimination from such a provision, would impermissibly alter the substance of the Reconstruction Amendments.
 
 
 108
 Nor can statutes that blithely disregard the divide between state and federal power qualify as congruent and proportional. To the contrary, measures passed under Congress's Section 5 power must minimize the extent to which they intrude on "States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." Boerne, 521 U.S. at 534, 117 S.Ct. 2157. Intrusion on a state's traditional regulatory power imposes too high a cost on that state unless there is a pattern or practice of unconstitutional conduct to justify it. Id. And nowhere does a state exercise its sovereignty more plainly than in regulating the sentencing and punishing of criminal offenders. See United States v. Lopez, 514 U.S. 549, 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law.") (internal quotation marks omitted). Regulation of the voting franchise is also a traditional function of state government. See U.S. Const. art. I, § 2, cl. 1; Oregon v. Mitchell, 400 U.S. at 125, 91 S.Ct. 260 ("No function is more essential to the separate and independent existence of the states and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices."). Indeed, I am hard pressed to envision any set of circumstances in which a statute that is read to prevent states from engaging in activity expressly approved in the Constitution, such as felon disenfranchisement (see U.S. Const. amend. XIV § 2), could be congruent and proportional. But especially here, where Congress has found no pattern of unconstitutional violations involving New York's felon-disenfranchisement statute, the application of Section 2 of the VRA to Section 5-106 intrudes on New York's sovereignty far in excess of any justification for doing so. Without congruence and proportionality, Section 2 of the VRA as applied to New York's felon-disenfranchisement statute exceeds the enforcement power granted to Congress by the Fourteenth and Fifteenth Amendments.
 
 
 109
 For the reasons expressed both in the majority opinion and in this opinion, I concur in the judgment.
 
 
 
 Notes:
 
 
 [1]
 It is true that the cases that define the limits of Congress's enforcement power have focused primarily on that power as granted by Section 5 of the Fourteenth Amendment, whereas the VRA is an exercise of both Section 5's enforcement power and the enforcement power granted by Section 2 of the Fifteenth Amendment. H.R.Rep. No. 89-439 (1965),reprinted in 1965 U.S.C.C.A.N. 2437; S.Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177. However, there is no significant reason to conclude that the scope of the enforcement power under the two amendments is different. First, the language of these two clauses is substantially identical: Congress has the power to "enforce" the provisions of the respective amendments "by appropriate legislation." U.S. Const. amend. XIV, § 5; id. amend. XV, § 2. Second, the Supreme Court has equated Congress's enforcement power under the two amendments. Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 373 n. 8, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (noting that "Section 2 of the Fifteenth Amendment is virtually identical to § 5 of the Fourteenth Amendment"); City of Boerne v. Flores, 521 U.S. 507, 517-18, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (describing Congress's power under the Fourteenth Amendment as "parallel" to that under the Fifteenth Amendment); Katzenbach v. Morgan, 384 U.S. 641, 650-51, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (describing Congress's power under the Fourteenth Amendment as "similar" to that under the Fifteenth Amendment). Third, the cases interpreting Congress's power under Section 5 of the Fourteenth Amendment consistently refer to cases concerning the VRA, a statute enacted pursuant to the power of both amendments, in an attempt to explicate the proper parameters of Congress's powers. E.g., Tennessee v. Lane, 541 U.S. 509, 520 n. 4, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); Garrett, 531 U.S. at 373, 121 S.Ct. 955; United States v. Morrison, 529 U.S. 598, 626, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); Boerne, 521 U.S. at 526, 117 S.Ct. 2157. There is no indication in Supreme Court precedent, or in logic, that the Congress and the legislatures that enacted and ratified the Fourteenth and Fifteenth Amendments intended that they be "enforced" in different ways.
 
 
 [2]
 It is insufficient for a court to make a finding of a history and pattern of unconstitutionality in the absence of a congressional finding to the same effect. The Supreme Court has never relied on a judicial finding alone to sustain prophylactic legislation
 
 
 [3]
 New York Election Law Section 5-106 disenfranchises prisoners and parolees. The statutory permanent disenfranchisement of felons, upheld against a similar challenge inJohnson v. Governor of Florida, 353 F.3d 1287 (11th Cir.2003), while it would be covered by the same analysis, is not directly at issue in this case.
 
 
 [4]
 As the dissent suggests, when the alleged constitutional violation at issue involves a suspect class such as race, more rigorous scrutiny of government action is appropriate, and it is therefore easier for Congress to establish a pattern of constitutional violationsSee Hibbs, 538 U.S. at 736, 123 S.Ct. 1972; Lane, 541 U.S. at 522-23, 124 S.Ct. 1978. But a pattern of violations must nonetheless be established. In this case, there is simply no evidence that banning felon-disenfranchisement laws would be an appropriate means of remedying intentional discrimination in voting.
 
 
 [5]
 Contrary to the dissent's implication, we have no quarrel with the Supreme Court decisions holding that, in many respects, the VRA is a model of congruent and proportional prophylactic legislationE.g., South Carolina v. Katzenbach, 383 U.S. at 337, 86 S.Ct. 803. Nothing in these holdings, however, guarantees that every possible application of the statute will be constitutional. Indeed, more than one member of the Supreme Court has left open the possibility that the entirety of Section 2, as amended, is constitutionally infirm. See Bush v. Vera, 517 U.S. 952, 990, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring) ("In the 14 years since the enactment of § 2(b), we have interpreted and enforced the obligations that it places on States in a succession of cases, assuming but never directly addressing its constitutionality."); Chisom v. Roemer, 501 U.S. 380, 418, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Kennedy, J., dissenting) ("Nothing in today's decision addresses the question whether § 2 of the Voting Rights Act of 1965 . . . is consistent with the requirements of the United States Constitution."). Here, I do not question the constitutionality of Section 2 as a whole. But I do believe that, under the dissent's interpretation of Section 2 as applying to New York's felon and parolee disenfranchisement statute, Section 2 exceeds constitutional limits.
 
 
 [6]
 The dissent suggests that my view leads to the inevitable conclusion that Congress lacks the authority to remedy race-based voter discriminationSee Dissent of Judge Parker at 362, infra. Not so. Congress may restrict the use of any device that results in discrimination against minority voters. To do so, however, it must first demonstrate that the device is part of a history and pattern of intentional racial discrimination.
 
 
 
 110
 STRAUB, Circuit Judge, with whom Judge SACK joins, concurring in part and concurring in judgment.
 
 
 111
 We concur in the result reached by the majority and in its reasoning that the evidence of legislative intent weighs decisively against applying the Voting Rights Act to New York Election Law § 5-106. We also, specifically, concur in the majority's limited remand for purposes of determining whether plaintiffs have stated a vote dilution claim on behalf of non-disenfranchised residents, based on New York's system of apportioning electoral districts. We do not join in any holding that a clear statement rule applies here, as we believe such a rule, in addition to being unnecessary to the disposition of this case, would be inappropriate in the voting rights context.
 
 
 112
 SACK, Circuit Judge, with whom Judge STRAUB joins with respect to Part I, concurring in part and concurring in judgment.
 
 
 113
 * I write separately principally to respond to a portion of the dissent of my colleague, Judge Calabresi, in which he concludes that Judge Straub and I, being "motivated in large part by skepticism that Congress could have intended the result that the plaintiffs urge," Dissent of Judge Calabresi, post, at 365-66, have confused the views of the current Congress with that of the Congress that enacted the Voting Rights Act and its 1982 amendments. Judge Calabresi may or may not be right on the merits of this case, but in this respect he is surely wrong. What the current Congress, or a Congress that will next consider voting rights, thinks or will think is Congress's business, not ours. The question here is what the statute means.
 
 
 114
 It is in response to that question that we join Judge Cabranes's opinion insofar as it concludes that Congress did not intend the Voting Rights Act to encompass the type of felon disenfranchisement law at issue in this case. By amending Section 2 of the Voting Rights Act in 1982, Congress apparently sought to make clear that Section 2 covered both vote denial and vote dilution, and to reinstate the "results test," which Congress found to be the rule developed in the voting rights case law before the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), particularly White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973).[1] Whatever one's view of the uses and misuses of legislative history to enlighten, or even to contradict plain meaning,[2] insofar as the 1982 amendment was aimed specifically at overruling Bolden and reinstating previous case law, it is not that difficult to discern what Congress meant to do when it said what it said. See United States v. Rybicki, 354 F.3d 124, 136 (2d Cir.2003) (en banc), cert. denied, 543 U.S. 809, 125 S.Ct. 32, 160 L.Ed.2d 10 (2004) (reasoning that when a statute is adopted for the purpose of overruling a Supreme Court decision which in turn overruled previous law on the subject, Congress likely intended to reinstate the previous law).
 
 
 115
 The case law that Congress sought to reinstate, so far as we can tell, involved cases in which "designedly or otherwise, an apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." Zimmer, 485 F.2d at 1304 (internal quotation marks omitted; alterations incorporated) (quoted in S. Rep. 97-417 (1982), *23, 1982 U.S.C.C.A.N. 177, **200). As such, the White-Zimmer factors, under which a court assesses the result of a voting law under the totality of the circumstances, seem to us to be particularly suited — even if not exclusively so — to claims of apportionment and legislative districting.[3] In amending the Voting Rights Act in 1982, Congress told the courts to resume doing what they had done in the White-Zimmer cases. There is no indication that any court pre-Bolden thought of using, let alone actually used, the White-Zimmer factors to strike down felon disenfranchisement laws. Cf. Rybicki, 354 F.3d at 138 (explaining that the phrase "intangible right of honest services" should be understood as codifying prior case law, and that "Congress was recriminalizing mail- and wire-fraud schemes to deprive others of that `intangible right of honest services,' which had been protected before McNally [v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)], not all intangible rights of honest services whatever they might be thought to be" (emphasis in original)).
 
 
 116
 The plain meaning argument — as articulated by Judge Parker in his powerful opinion — is of course a compelling one. But none of our colleagues yet, so far as we can see, has presented a persuasive reason to think that if the language of section 2 covers felon disenfranchisement laws as applied to persons duly imprisoned, the result was intentional rather than an accident resulting from the breadth and generality of language used to accomplish specific, identifiable goals. At the end of the day, the notion that by using such language Congress "accidentally meant to" address the long-standing, nearly universal felon disenfranchisement laws recognized in the Fourteenth Amendment, just does not make sense to us. "Boggling," perhaps, is in the mind of the beholder. See Dissent of Judge Calabresi, post at 367.
 
 II
 
 117
 Although I don't think it to be dispositive, I am also troubled that the central concern of these plaintiffs, obviously of enormous importance, seems to be tangential at best to the relief they seek under the Voting Rights Act. The plaintiffs assert that, in New York, criminal law-enforcement, prosecution, and punishment are corrupted by a deeply ingrained institutional bias against Blacks and Latinos. They "allege[] that the stark differences in incarceration and probation rates for Blacks and Latinos in New York, as opposed to Whites, have resulted from discrimination in New York's criminal justice system." Dissent of Judge Parker at 343.[4] Perhaps giving the plaintiffs the right to vote from prison would have some positive impact on that system, but it would be a highly unusual remedy, in light of the ubiquitous state felon disenfranchisement laws, addressing the pleaded wrong very indirectly, indeed. It gives me pause: Did Congress mean, through the use of the general language of the Voting Rights Act, to seek to address the problem of racial discrimination in the states' administration of criminal justice?
 
 III
 
 118
 I note, finally, that there may well be important distinctions between the impact of the felon disenfranchisement statute at issue here and those that provide for lifetime disenfranchisement, whether or not the difference matters for purposes of the Voting Rights Act analysis. They appear to me to be very different: One type (the one before us) appears to be connected to the issue of punishment — the removal of criminals from society for a term, for purposes of punishment, the safety of society, "rehabilitation" and the like. The other seems ultimately untethered to punitive segregation, since the disenfranchisement persists long after termination of the segregation, at which point punitive ends seem no longer to be at issue. Today's decision, of course, explicitly leaves the issue open. See Maj. Op. at 314.
 
 
 
 Notes:
 
 
 [1]
 As the Senate Report declared: "This Amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of section 2. It thereby restores the legal standards, based on the controlling supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved inMobile v. Bolden. The Amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-Bolden vote-dilution case, White v. Regester." See S.Rep. No. 97-417 (1982), *2, 1982 U.S.C.C.A.N. 177, **179 (footnotes omitted).
 
 
 [2]
 Compare Dissent of Judge Parker, post, at 346-48, with Dissent of Judge Katzmann, post, at 368-69.
 
 
 [3]
 These factors, summarized inThornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), are:
 
 
 [1]
 the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 [2]
 the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 [3]
 the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 [4]
 if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 [5]
 the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 [6]
 whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 [7]
 the extent to which members of the minority group have been elected to public office in the jurisdiction
 Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 S. Rep., at 28-29, U.S.Code Cong. & Admin. News 1982, pp. 206-207.
 Thornburg, 478 U.S. at 36-37, 106 S.Ct. 2752.
 
 
 [4]
 In statistical terms, the plaintiffs' First Amended Complaint "alleges that Blacks and Latinos are prosecuted, convicted, and sentenced to incarceration at rates substantially disproportionate to those of Whites. It also alleges that while Blacks and Latinos make up 86% of the total current prison population and 82% of the parolee population, they comprise only 31% of New York State's overall population. It further alleges that Blacks and Latinos are sentenced to incarceration at substantially higher rates than Whites, and Whites are sentenced to probation at substantially higher rates than Blacks and Latinos." Dissent of Judge Parker at 344. At this stage of the proceedings, of course, we take those allegations to be trueSee, e.g., Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.2002).
 
 
 
 119
 RAGGI, Circuit Judge, concurring, with whom Judge JACOBS joins.
 
 
 120
 I fully concur in the majority opinion's thoughtful analysis of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, and in its conclusion that the law must be construed not to encompass felon disenfranchisement statutes, particularly New York Election Law § 5-106. I write separately only to expand on its discussion of why we require a clear statement of congressional intent to allow plaintiffs to pursue a VRA challenge to § 5-106.
 
 
 121
 Section 2 of the VRA prohibits the use of any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Intentional discrimination is not required to establish a violation. Rather, a factfinder considers "the totality of circumstances," id. at § 1973(b), to determine whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [voters of different races or color] to elect their preferred representatives," Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).
 
 
 122
 While acknowledging the presumptive validity of felon disenfranchisement laws, see Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (rejecting Equal Protection challenge), plaintiffs and supporting amici submit that New York's practice of prisoner disenfranchisement violates the VRA because there is a gross racial disparity in the state prison population. If permitted to pursue their claim, they seek to show that this disparity is a product of pervasive racism infecting every part of the New York criminal justice system, from stop and frisk determinations by police officers on the street, to charging decisions by prosecutors, to detention and sentencing rulings by state court judges. In short, plaintiffs propose to use the VRA to indict the New York criminal justice system for racism.
 
 
 123
 So employed, the VRA would not only significantly intrude on, but also seriously disrupt, the orderly administration of criminal justice in New York, obviously a matter of legitimate state interest. Plaintiffs' suit would effectively impugn the constitutionality of countless state convictions without necessarily proving that any one prosecution or sentence was, in fact, discriminatory. Equally disturbing, the state's criminal justice system could be adjudged discriminatory without New York being required to release, retry, or resentence a single prisoner. New York would just have to give prisoners the vote. Such a result would undoubtedly undermine public confidence in all state criminal proceedings at the same time that it bred cynicism toward federal law for responding to such a serious problem with so ill-fitting a remedy.
 
 
 124
 Of course, Congress may enact laws that remedy aspects of particular problems — whether voter discrimination or invidious bias in the administration of criminal justice — without offering complete solutions. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). But when, as this case demonstrates, a VRA challenge to § 5-106 would so seriously undermine the legitimacy of the state's criminal justice system, it is appropriate to require a clear statement of congressional intent to have the VRA apply to felon disenfranchisement laws.
 
 
 125
 In reaching this conclusion, I am mindful that state felons are not without a federal means to challenge race discrimination in state criminal proceedings. They may petition for a writ of habeas corpus. See 28 U.S.C. § 2254. Indeed, § 2254 stands as a clear expression of congressional intent to recalibrate the federal-state balance with respect to criminal justice so as to afford every state prisoner who thinks himself the victim of racial bias in prosecution or sentencing at least one opportunity to be heard in federal court. The law recognizes habeas corpus as "the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." Heck v. Humphrey, 512 U.S. 477, 481, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (citing Preiser v. Rodriguez 411 U.S. 475, 488-90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Thus, plaintiffs are careful to emphasize that they do not seek immediate or speedier release. Nevertheless, Heck is instructive. There, the Supreme Court ruled that a prisoner cannot use 42 U.S.C. § 1983 as a vehicle to recover money damages on a claim that, at its core, attacks the validity of a conviction that has not been reversed or vacated on direct appeal or by the grant of a petition for a writ of habeas corpus. See id. at 486-87, 114 S.Ct. 2364. So in this case, there is similar reason to proceed cautiously and to require a clear statement of intent by Congress before allowing a class of prisoners to use the VRA to sue for the vote when their claim, at its core, attacks not simply their own unreversed, unvacated individual convictions, but countless unspecified convictions in the state of New York.
 
 
 126
 In sum, while I fully concur in the judgment of the court for the reasons discussed in the majority opinion, that conclusion is reinforced by the reasons stated in this opinion.
 
 
 127
 JACOBS, Circuit Judge, concurring.
 
 
 128
 The Opinion of the Court by Judge Cabranes covers the field, and I concur in it. The Opinion proceeds in the scholarly, systematic way needed to meet and rebut the arguments generated by years of ceaseless effort to enroll felons as members of the electorate. Although it has become necessary to meet these arguments and casuistries laboriously on their own terms, the case can be decided more simply.
 
 
 129
 Section 1973 is composed of subsections (a) and (b). Subsection (b) references and implements (a); so they must be read together. A reading that puts them at cross-purposes is untenable and cannot be called plain meaning.
 
 
 130
 The plaintiffs invoke subsection (a) as the premise for a right of felons to join the electorate:
 
 
 131
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 USCS § 1973b(f)(2)], as provided in subsection (b).
 
 
 132
 42 U.S.C. § 1973(a) (emphasis added). Subsection (b) expressly furnishes a touchstone for detecting a violation of the right to vote that is protected in subsection (a):
 
 
 133
 (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .
 
 
 134
 42 U.S.C. § 1973(b) (emphasis added).
 
 
 135
 The right to vote in subsection (a) is thus informed by subsection (b): in particular, every "class of citizens protected by subsection (a)" (in this appeal, African-Americans) is composed of citizens who by law may and should enjoy as full an "opportunity [as] other members of the electorate to participate in the political process." Such a full "opportunity" includes the freedom to ring doorbells, speak on street-corners, assemble and rally, raise contributions (subject to campaign finance rules), and campaign for candidates everywhere the public can be found.
 
 
 136
 Thus no "class of persons protected by subsection (a)" could include felons who would otherwise be in that class, because some felons (i.e., prisoners) are legitimately deprived by the State of the full opportunity to participate in the political process, and would be so deprived even if they could vote. The enfranchisement of felons can never be a remedy for a violation of subsection (a) because afterward, the "class of citizens protected by subsection (a)" would still include persons who suffer a state-imposed deficit of the "opportunity" enjoyed by "other members of the electorate to participate in the political process . . . ." By the same token, the disenfranchisement of felons cannot be a practice that is limited by subsection (a).
 
 
 137
 Section 1973, read as a whole, does not allow a reading that would consider felons to be members of any "class of citizens protected by subsection (a)." It follows that no erosion of felon disenfranchisement was intended by the legislative intelligence that drafted and joined together the two complementary subsections.
 
 
 138
 Judge Parker's dissent (at footnote 1) responds in the words of Chisom v. Roemer, 501 U.S. at 395, 111 S.Ct. 2354, that the "purposes" of Section 2 "are apparent from its text": to adopt a "results test" in Section (a) and to give guidance in Section (b) "about how the results test is to be applied." So far, so good; and Chisom thus reconfirms that (a) and (b) are to be read together. The dissent then goes on, however — "[i]n other words" — to make a point that better serves the dissent's reading. My point remains, unimpaired: Sections (a) and (b), read together and given their plain meaning, reflect a draftsman's assumption that the enactment protects the rights of all who may and should enjoy as full an "opportunity [as] other members of the electorate to participate in the political process" and no one else — not children, not aliens, and not the imprisoned. Section 1973 reads unambiguously as a guarantee of rights for free people, and has nothing to do with the voting of persons who are not permitted to make unmonitored phone calls, or to go at large, or to eat their food with knives and forks.[1] Arguments to the contrary demean the Voting Rights Act.
 
 
 
 Notes:
 
 
 [1]
 Judge Calabresi points out in response that Hayden is on parole and therefore has the capacity to participate fully in the political process even though he cannot vote. The issue, however, is whether Congress intended the Voting Rights Act to enfranchise felons, a population that necessarily includes those who are incarcerated. That population includes, for example, Jalil Abdul Muntaqim, the plaintiff whose case we originally agreed to hear when we undertook to review this issueen banc. Muntaqim cannot fully participate in the political process for the very good reason that he is being incarcerated long-term for having murdered two police officers.
 Judge Calabresi's second point is that felon disenfranchisement laws motivated by intentional discrimination are unconstitutional under the Fourteenth Amendment, by virtue of Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). But nothing in Hunter v. Underwood applies to the intent of Congress in enacting Section 1973. As to that intent, I agree with Judge Calabresi that the present Congress would not enfranchise Death Row; I do not share his apparent belief that some earlier Congress thought this would be a good idea.
 B.D. PARKER, JR., Circuit Judge, dissenting.
 The essence of a Section 2 claim under the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality along racial lines in the opportunities of voters to elect their preferred representatives. See Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The majority, in my view, reaches the wrong result about § 2 for a host of reasons, not the least of which is that it attacks the wrong question. The operative inquiry on this appeal is not whether a historic policy of felon disenfranchisement, read next to odds and ends from legislative histories, indicates Congress's intention to exclude felon disenfranchisement laws from the coverage of the VRA. Rather, this appeal begins and ends with the simple question of whether we should read an unambiguous remedial statute, intended to have, as the Supreme Court has emphasized, the "broadest possible scope," to allow the Hayden plaintiffs' claims to go forward. Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). I believe we should.
 The amended complaint alleges that the stark differences in incarceration and probation rates for Blacks and Latinos in New York, as opposed to Whites, have resulted from discrimination in New York's criminal justice system. Under New York law, incarcerated felons and felons on parole cannot vote. See N.Y. Election Law § 5-106. Section 2(a) of the VRA provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a) (emphasis added). New York Election Law § 5-106 imposes a voting qualification. It denies those convicted of felonies the opportunity to vote. The Hayden plaintiffs allege that § 5-106 violates § 2(a) because it results in a denial or dilution of the right to vote on account of race. Because I believe these contentions state a claim upon which relief can be granted, I respectfully dissent.
 A.
 For purposes of this appeal we must treat as unassailable the Hayden plaintiffs' allegations that New York systematically discriminates against its minority citizens through its felony disenfranchisement law. This case was resolved in the district court on a Rule 12(c) motion for judgment on the pleadings. Consequently, we must accept the allegations in the complaint as true and benefit the plaintiffs with all reasonable inferences. Greco v. Trauner, Cohen & Thomas, L.L.P., 412 F.3d 360, 363 (2d Cir.2005). Under that Rule, the Hayden plaintiffs are entitled to prevail unless it appears beyond doubt that they can prove no facts in support of their claims which would entitle them to relief. Id.
 Though the Hayden plaintiffs may have a difficult time mustering sufficient proof, they are, at the very least, entitled to that opportunity. The Supreme Court has left us no room whatsoever to question this approach: "Even if serious problems lie ahead in applying the `totality of circumstances' standard described in [VRA] § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress." Chisom v. Roemer, 501 U.S. 380, 403, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).
 The majority concludes that felon disenfranchisement laws are immune from VRA scrutiny, no matter how discriminatory the effects of those laws might be. A review of the plaintiffs' allegations, which state a paradigmatic claim of discriminatory disenfranchisement, demonstrates the impropriety of treating this case differently than any other VRA case. Even if the following allegations are true, the majority finds, they do not offend the VRA in the slightest.
 The First Amended Complaint is replete with allegations of racial disparities resulting from the operation of New York Election Law § 5-106. It alleges that Blacks and Latinos are prosecuted, convicted, and sentenced to incarceration at rates substantially disproportionate to those of Whites. Hayden First Amended Complaint at ¶ 61. It also alleges that while Blacks and Latinos make up 86% of the total current prison population and 82% of the current parolee population, they comprise only 31% of New York State's overall population. Hayden First Amended Complaint at ¶ 64. It further alleges that Blacks and Latinos are sentenced to incarceration at substantially higher rates than Whites, and Whites are sentenced to probation at substantially higher rates than Blacks and Latinos. Hayden First Amended Complaint at ¶ 66. The collective impact of these statistics, according to the First Amended Complaint, is that Blacks and Latinos comprise nearly 87% of those currently denied the right to vote pursuant to New York Election Law § 5-106. Hayden First Amended Complaint at ¶ 68.
 There is no substantive record in this case. None of us knows what reality — if any — exists behind these allegations. Significantly, each of the other circuits that has wrestled with this issue has done so on the basis of a fully-developed summary judgment record, not simply on the pleadings. For instance, in support of their vote denial claim, the plaintiffs in Farrakhan v. Washington, 338 F.3d 1009 (9th Cir.2003), reh'g en banc denied, 359 F.3d 1116 (9th Cir.2004), presented "statistical evidence of the disparities in arrest, bail and pre-trial release rates, charging decisions, and sentencing outcomes in . . . Washington's criminal justice system," submitted expert declarations, reports, and studies and relied on them to show "the extent to which these disparities could be attributed to racial bias and discrimination," and offered evidence of the "tenuous policy justifications for Washington's felon disenfranchisement law," and of the "discriminatory intent that guided the enactment of these laws." Id. at 1013. The plaintiffs in the Eleventh Circuit presented a similarly robust summary judgment record. See Johnson v. Governor of Fla., 405 F.3d 1214, 1230 n. 31 (11th Cir.2005) (en banc); id. at 1241-42 (Wilson, J., concurring in part and dissenting in part); see also Johnson v. Governor of Fla., 353 F.3d 1287, 1293, 1294-96, 1301-02, 1304-06 (11th Cir.2003) (analyzing the considerable record of statistical evidence and expert reports presented by plaintiffs in support of their claims), vacated by 377 F.3d 1163 (11th Cir.2004).
 Here, by contrast, we have no analysis of the disparities in New York's criminal justice system. We have no facts to think about. We have no expert reports or studies on whether these disparities can be attributed to racial bias or to other factors. Consequently, none of us can say with the requisite certainty what actually occurred in New York to create the anomalies catalogued in the First Amended Complaint. The Hayden plaintiffs want the opportunity to eliminate other reasons for these disparities and to prove that their inability to vote is the product of discrimination in the criminal justice system. If they do so, they could well prove a violation of the VRA.
 Suppose, for example, they were able to demonstrate that the dramatically different incarceration rates for minorities and Whites in New York were largely driven by drug convictions and reflected the manner in which law enforcement resources were deployed in the "war on drugs." Suppose they showed that law enforcement officials (and task forces) concentrated resources on street-level users/dealers of heroin and crack cocaine in minority neighborhoods (because the problems were worse and arrests were easier in such areas) but, at the same time, devoted comparatively little attention to areas where Whites were abusing those same illegal drugs at the same rates (and powder cocaine at higher rates). Suppose they also showed that Whites received probation three times as frequently as similarly situated Blacks or Latinos for similar crimes. Neither showing is remotely beyond the realm of possibility in New York, and I believe this type of proof could constitute some evidence of a VRA violation. Yet this would be the very type of undertaking that the majority would preclude. Whether or not the Hayden plaintiffs ultimately succeed is, at this point, irrelevant. The issue is whether the VRA affords them the opportunity to make the effort. If the majority is correct, the Congresses that passed the VRA in 1965, and extended it in 1982, did not intend for the statute to reach situations such as these. I do not believe those Congresses intended any such thing; and I reach that conclusion simply by reading the words they used.
 No one disputes that states have the right to disenfranchise felons: § 2 of the Fourteenth Amendment makes that clear. See U.S. Const. amend. XIV, § 2 ("when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State . . . or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced . . . ."); see also Richardson v. Ramirez, 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974).
 But, as will be explored below, the fact that felon disenfranchisement statutes may sometimes be constitutional does not mean they are always constitutional. And certainly, the fact that they sometimes may be constitutional does not mean that they are immune from congressional regulation. In any event, this case is largely about the Fifteenth, not the Fourteenth Amendment. Section 1 of the Fifteenth Amendment makes it clear that states may not disenfranchise on the basis of race. See U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."). Section 2 of the VRA, as amended in 1982, also makes it clear that states may not disenfranchise on the basis of race, even unintentionally. See Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 482, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) ("When Congress amended § 2 [of the VRA] in 1982, it clearly expressed its desire that § 2 not have an intent component.") (emphasis omitted); Thornburg, 478 U.S. at 43-44, 106 S.Ct. 2752 (explaining that the 1982 amendments to § 2 of the VRA were a rejection of the position of the plurality in Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which "required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters").
 Thus, as Judge Wilfred Feinberg, writing for half of our evenly divided en banc Court in Baker v. Pataki, 85 F.3d 919 (2d Cir.1996) (en banc), said: "While a State may choose to disenfranchise some, all or none of its felons based on legitimate concerns, it may not do so based upon distinctions that have the effect, whether intentional or not, of disenfranchising felons because of their race." Id. at 937. If the majority is correct, this proposition is false.
 B.
 In order to justify its failure to apply the plain language of VRA § 2, the majority must find ambiguity in that provision's pellucid language. Tellingly, the majority never attempts to argue that § 2(a) is ambiguous, instead stating that "[w]e are not convinced that the use of broad language in [§ 2(a)] necessarily means that the statute is unambiguous with regard to its application to felon disenfranchisement laws." Maj. Op. at 315. But this statement is not a finding of ambiguity. The majority acknowledges that "there is no question that the language of § 1973 is extremely broad . . . and could be read to include felon disenfranchisement provisions . . . ." Id. The real question is whether it can be read any other way. Conspicuously absent from the majority opinion is so much as a hint of any intelligible reading under which § 5-106 is not a "voting qualification or prerequisite to voting or standard, practice or procedure." (What else on earth could § 5-106 possibly be?)
 The majority cites Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), which states that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341, 117 S.Ct. 843 (finding that "the term `employees' . . . is ambiguous as to whether it excludes former employees"). Robinson did not suggest that ambiguity could be determined by reference to legislative history or telling silences. More importantly, the majority disregards the stern warning that accompanied the passage it quoted: "Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Id. at 340, 117 S.Ct. 843 (emphasis added) (internal quotation marks omitted). The majority's inquiry plunges ahead with no finding that the statutory language is ambiguous, in direct disregard of the Supreme Court's instructions.
 Finding no support in the text and no ambiguity, the majority turns to various secondary and tertiary sources. In each instance, the source is employed to try to show that Congress did not mean what it said. The most prominent of the extra-textual sources enlisted by the majority are "context," "background assumptions supplied by other statutory and Congressional wording," "history," and "manifestations of intent by Congress at the time of the VRA's enactment and thereafter." Maj. Op. at 315. Rather than follow the majority into this slough, I believe we should heed the Supreme Court's instruction that when "the meaning of [a statute's] text is plain and unambiguous, we need not accept [an] invitation to consider the legislative history." Whitfield v. United States, 543 U.S. 209, 215, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005).
 To begin, resort to these types of sources is conspicuously inappropriate because the VRA, while broad, is not ambiguous. Tellingly, the very panel that decided Muntaqim v. Coombe, 366 F.3d 102 (2d Cir.2004), conceded this point. The original Muntaqim panel said "section 1973, while vague, does not seem ambiguous." Id. at 128 n. 22 (citing 42 U.S.C. § 1973). Given this concession, our responsibility, as we have been reminded time and time again, is to apply the statute as Congress wrote it. Accordingly, "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says." Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (internal quotation marks omitted). "[I]n interpreting a statute a court should always turn first [to this] one, cardinal canon before all others. . . . When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal quotation marks omitted).
 The majority's counter-weight to all of this authority is Justice Holmes' language from the 1920s to the effect that the plain meaning of the text does not necessarily "preclude consideration of persuasive evidence if it exists." Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928). I certainly dispute that the majority's evidence is anything close to "persuasive," but, regardless, this proposition has not been good law for many years. The modern view is that the "authoritative statement" of Congress's intent is "the statutory text, not the legislative history or any other extrinsic material." Exxon Mobil Corp. v. Allapattah Servs., Inc., ___ U.S. ___, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005); see also United States v. Wells, 519 U.S. 482, 509-10, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (Stevens, J., dissenting) ("Congress [in the past] looked to the courts to play an important role in the lawmaking process by relying on common-law tradition and common sense to fill gaps in the law — even to imply causes of action and remedies that were not set forth in statutory text. . . . The Court's approach to questions of statutory construction has changed significantly since that time."). See generally William N. Eskridge, Jr., The New Textualism, 37 UCLA L.Rev. 621 (1990). The majority's variation on Justice Holmes' position is its view that it is not bound by the plain language of the VRA because "[t]he plain meaning of legislation should be conclusive, except in the `rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); accord Stoltz v. Brattleboro Hous. Auth. (In re Stoltz), 315 F.3d 80, 89 (2d Cir. 2002).
 But this case does not present a "rare" or "exceptional" circumstance where following the rules would lead to a result "so bizarre that Congress could not have intended it." Demarest v. Manspeaker, 498 U.S. 184, 191, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (emphasis added) (internal quotation marks omitted). Indeed, just the opposite is true. In Allen v. State Board of Elections, supra, the Supreme Court observed that § 2(a) of the VRA, as originally drafted, included only a prohibition against any voting "qualification or procedure." 393 U.S. at 566, 89 S.Ct. 817. After concerns were raised that this language may not be sufficiently expansive to cover all practices that could deny individuals the right to vote on account of their race, Congress expanded the language in the final version to include any "voting qualifications or prerequisites to voting, or standard, practice, or procedure." Id. at 567, 89 S.Ct. 817 (quoting 42 U.S.C. § 1973(a)). The Supreme Court viewed this change as "[i]ndicative of [Congress's] intention to give the Act the broadest possible scope." Allen, 393 U.S. at 566-67, 89 S.Ct. 817.
 In keeping with the general principle that courts should interpret the VRA to provide "the broadest possible scope in combating racial discrimination," Chisom, 501 U.S. at 403, 111 S.Ct. 2354 (internal quotation marks omitted), the Supreme Court has interpreted § 2 to apply to a wide variety of election and voting practices. See, e.g., Growe v. Emison, 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (holding that VRA should be interpreted broadly to cover single member district plans); Houston Lawyers' Ass'n v. Att'y Gen. of Tex., 501 U.S. 419, 428, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991) (same for the method of electing state trial judges); Chisom, 501 U.S. at 404, 111 S.Ct. 2354 (same for the method of electing state appellate court judges); see also Voinovich v. Quilter, 507 U.S. 146, 154, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (assuming, without deciding, that VRA covers claims of "influence" dilution). Reading the section to cover felon disenfranchisement laws is fully consistent with this line of cases. Since everyone agrees that Congress amended § 2 in 1982 in an express effort to broaden the protection afforded by the VRA, we are hard pressed to understand the majority's conclusion that, at that same time, Congress, without comment, intended to except an important voting test from that protection. See Chisom, 501 U.S. at 403-04, 111 S.Ct. 2354.[1]
 Although the majority would prefer to look beyond the plain language of § 2(a), "judicial review must end at the statute's unambiguous terms." Brodie v. Schmutz (In re Venture Mortgage Fund, L.P.), 282 F.3d 185, 188 (2d Cir.2002). Though some may question the wisdom of Congress's decision to enact a statute that permits challenging felon disenfranchisement laws, we are judges, not policy-makers. If different policy-based outcomes are generally desired, Congress may always amend the VRA. But that is its job, not ours.
 C.
 The majority nonetheless concludes that we are relieved of the obligation to respect the text of VRA § 2, and, in construing it, may look behind its words for essentially three reasons: (1) the explicit approval given felon disenfranchisement laws in the Fourteenth Amendment; (2) various pieces of legislative history indicating the VRA was not intended to reach such laws; and (3) the long history and continuing prevalence of felon disenfranchisement provisions throughout the United States. See Maj. Op. at 315-16. The common denominator of each of these reasons is that it is factitious.
 
 
 [1]
 Section 2 of the Fourteenth Amendment
 The primary point of departure for the majority is the mention of felon disenfranchisement in § 2 of the Fourteenth Amendment. U.S. Const. amend. XIV, § 2. The majority's reliance on this provision is misplaced. The Constitution does not endorse felon disenfranchisement when it declines to prohibit that practice, any more than the Constitution endorses felon enslavement when the Thirteenth Amendment states: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States . . . ." U.S. Const. amend. XIII, § 1 (emphasis added). Declining to prohibit something is not the same as protecting it.
 Nor has the Supreme Court read any special immunity for felon disenfranchisement into the Fourteenth Amendment. In Richardson, the Court considered a claim that § 1 of the Fourteenth Amendment prohibited felon disenfranchisement altogether. 418 U.S. at 33, 94 S.Ct. 2655. The Court rejected this claim on the reasonable basis that the Fourteenth Amendment would not need an exception for felon disenfranchisement in § 2 if it intended to prohibit it altogether in § 1. Id. at 43. Richardson did not grant felon disenfranchisement immunity against any other ground of invalidity; it simply held that denying the vote to felons was not a per se violation of the Fourteenth Amendment.
 Unquestionably, Richardson did not authorize the use of felon disenfranchisement for discrimination, as the Supreme Court made clear in Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). See Baker, 85 F.3d at 937. Hunter involved an attack under 42 U.S.C. § 1981 and § 1983 on a provision in the Alabama Constitution of 1901 that intentionally disenfranchised Blacks. Hunter, 471 U.S. at 223-24, 105 S.Ct. 1916. The Supreme Court unanimously held that the provision was unconstitutional, and in so doing addressed the relationship between § 2 of the Fourteenth Amendment and felon disenfranchisement as follows:
 The single remaining question is whether [the Alabama provision] is exempted from the operation of the Equal Protection clause of § 1 of the Fourteenth Amendment by the "other crime" provision of § 2 of that Amendment. . . . [W]e are confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [the Alabama provision] which otherwise violates § 1 of the Fourteenth Amendment.
 Hunter, 471 U.S. at 233, 105 S.Ct. 1916. As Judge Feinberg so correctly observed: "[b]efore Hunter, it might have been plausibly argued that § 2 of the Fourteenth Amendment carves all aspects of felon disenfranchisement out of the purview of the Equal Protection Clause, which is in the very same amendment." Baker, 85 F.3d at 936. But because the "other crimes" provision of § 2 of the Fourteenth Amendment did not foreclose the Equal Protection challenge to Alabama's felon disfranchisement law in Hunter, it necessarily follows that Congress also has the power under the Fourteenth Amendment to regulate potentially discriminatory felon disenfranchisement statutes, as it did when it passed the VRA.
 More to the point, § 2 of the Fourteenth Amendment — which expressly contemplated and essentially sanctioned racially discriminatory voting qualifications — in no way diminishes Congress's power to enforce the Fifteenth Amendment. The majority fails to appreciate that the operative provisions of the VRA were enacted pursuant to Congress's power under the Fifteenth Amendment. See Chisom, 501 U.S. at 383, 111 S.Ct. 2354 ("The preamble to the Voting Rights Act of 1965 establishes that the central purpose of the Act is to enforce the fifteenth amendment to the Constitution of the United States.") (internal quotation marks omitted); see also South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) ("Congress assumed the power to prescribe these remedies from § 2 of the Fifteenth Amendment, which authorizes the National Legislature to effectuate by `appropriate' measures the constitutional prohibition against racial discrimination in voting.").[2]
 Moreover, when it added the results test of VRA § 2 in 1982, Congress invoked its powers to enforce by "appropriate legislation" both the Fifteenth Amendment's guarantee that no citizen will be denied the right to vote on account of race and the Fourteenth Amendment's guarantee of racial equality. See S.Rep. No. 97-417, at 27, 39 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 205, 217. Thus, the results test is grounded in both the Fourteenth and the Fifteenth Amendments. In most instances, it is immaterial whether Congress's enforcement powers are grounded in one amendment or the other. This case, however, is different.
 Congress's enforcement powers under the Fourteenth and Fifteenth Amendments overlap in certain areas. Nevertheless, the Fifteenth Amendment provides a separate, distinct source of congressional power to regulate racially discriminatory voting restrictions. See, e.g., Rice v. Cayetano, 528 U.S. 495, 522, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (holding that a voting qualification that satisfies the Fourteenth Amendment's one-person, one-vote rule may nevertheless violate the Fifteenth Amendment's "race neutrality command," because the "Fifteenth Amendment has independent meaning and force"); see also Neal v. Delaware, 103 U.S. 370, 389, 26 L.Ed. 567 (1881) ("Beyond question the adoption of the Fifteenth Amendment had the effect, in law, to remove from the State Constitution, or render inoperative, that provision which restricts the right of suffrage to the white race."); United States v. Reese, 92 U.S. 214, 218, 23 L.Ed. 563 (1876) ("[T]he [Fifteenth] amendment has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude.").
 While § 2 of the Fourteenth Amendment permitted states to deny voting rights to their citizens (but threatened to reduce their representation if they did), the Fifteenth Amendment took a more sweeping approach: It expressly prohibited states from abridging the right to vote "on account of race." U.S. Const. amend. XV § 1. Even if the reference to criminal disenfranchisement in § 2 of the Fourteenth Amendment could somehow be construed to limit Congress's power under that Amendment to reach criminal disenfranchisement laws with racially discriminatory results, the Fifteenth Amendment's later, comprehensive ban on race discrimination in voting could not possibly be reasonably read in that way, since it is unqualified.
 The text and the legislative history of the Fifteenth Amendment demonstrate that it did not simply mimic § 2 of the Fourteenth Amendment, but, instead, broke new ground by instituting a ban on any disenfranchisement based on race.[3] Recall that § 2 of the Fourteenth Amendment was a structural successor to the Three-Fifths Clause of the original Constitution. See Richardson, 418 U.S. at 43-45, 94 S.Ct. 2655; see also U.S. Const. art. I, § 2, cl. 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons . . . three fifths of all other Persons."), amended by U.S. Const. amend. XIV, § 2. The concern of the Republican legislators who drafted § 2 of the Fourteenth Amendment was that, with the slaves emancipated, the Three-Fifths Compromise would be inoperative, freedmen would therefore be counted fully in decennial censuses, and the former slave states would soon be entitled to enough additional representatives to threaten Republican control of the federal government. See Richardson, 418 U.S. at 73-74, 94 S.Ct. 2655 (Marshall, J., dissenting); Foner, supra note 3, at 251-61. Section 2 of the Fourteenth Amendment explicitly contemplated that states would deny voting rights to their citizens, including through race-based disenfranchisement, and therefore adjusted the states' representation in Congress to ensure that Southern White Democrats could not control the national government by disenfranchising Blacks. See Foner, supra note 3, at 252, 255, 259. As the Supreme Court observed, the framers of § 2 of the Fourteenth Amendment "were primarily concerned with the effect of reduced representation upon the States, rather than with the two forms of disenfranchisement which were exempted from that consequence." Richardson, 418 U.S. at 43, 94 S.Ct. 2655.
 In practice, § 2 of the Fourteenth Amendment was immediately succeeded by the Military Reconstruction Acts of 1867, which essentially prohibited any state from reentering the Union if it barred Blacks from voting in state constitutional conventions. See, e.g., An Act To Provide for the More Efficient Government of the Rebel States, ch. 153, § 5, 14 Stat. 428, 429 (Mar. 2, 1867) (effectively enfranchising "male citizens of said State, twenty-one years old and upward, of whatever race, color or previous condition, who have been resident in said State for one year previous to the day of such election, except as may be disenfranchised for participation in the rebellion or for felony at common law" to elect delegates for state constitutional conventions). In effect, by means of the Military Reconstruction Acts of 1867, Southern states that denied the franchise to Blacks would be denied any representation in Congress. Then, with Southern Blacks voting in large numbers by the election of 1868, Congress enacted the Fifteenth Amendment to enfranchise Blacks in Northern and border states, entrench the franchise for Black males nationwide, and prevent any future retrenchment. See generally Gillette, supra note 3. The Fifteenth Amendment thus provided an additional tool for rooting out discrimination in voting.
 In sum, the Fifteenth Amendment was enacted, among other reasons, precisely because the Fourteenth Amendment — including § 2 — did not prohibit states from disenfranchising Blacks.[4] Section 2 of the Fourteenth Amendment, after all, expressly contemplates that a state might bar Blacks from the polls; it simply exacts a price in reduced representation. The Supreme Court in United States v. Reese, supra, writing only five years after the ratification of the Fifteenth Amendment, put it simply: "Previous to this [Fifteenth] amendment, there was no constitutional guaranty against this discrimination: now there is." 92 U.S. at 218.
 The Fifteenth Amendment was thus not an extension or continuation of § 2 of the Fourteenth Amendment. It took a diametrically different approach and conferred a right not previously secured by the Constitution. While the Supreme Court has not found felon disenfranchisement laws to be per se unconstitutional under the Fourteenth Amendment, it has never suggested that they are insulated from challenges under a statute passed to enforce the Fifteenth Amendment's ban on racial discrimination in voting. The claim at issue in this case is, therefore, firmly imbedded in the Fifteenth Amendment and cannot be made to disappear by citing § 2 of the Fourteenth Amendment.
 
 
 [2]
 Legislative history of the VRA
 "Judicial investigation of legislative history has a tendency to become . . . an exercise in looking over a crowd and picking out your friends." Allapattah Servs., 125 S.Ct. at 2626 (internal quotation marks omitted). The majority is no exception, having drafted a number of "friends" to help it around unambiguous statutory language. See Maj. Op. at 317-23. However, even assuming justification exists for disregarding the language of a statute — a proposition I disfavor — the committee reports, floor debates, and stray comments cited by the majority do not, in my view, trump the text of VRA § 2(a).
 The majority first looks to the legislative history of § 4 of the VRA, for assistance in explicating § 2(a) of the Act. See Maj. Op. at 318-19. The probability of useful results from such an exercise is nearly always extremely low because the legislative history of one section of an expansive statute such as the VRA is typically of no value in understanding another, entirely different section. Section 4(a) of the VRA banned the use, in jurisdictions with a demonstrated history or racial discrimination, of "any test or device" to limit the ability to vote in order to "assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color." 42 U.S.C. § 1973b(a)(1).[5] Section 4(c) defined the phrase "test or device" as
 any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.
 42 U.S.C. § 1973b(c).
 Thus, § 4 and § 2(a) employ starkly different language that dramatically distinguishes their scope. Section 4's use of the narrow terms "any test or device," 42 U.S.C. § 1973b(a)(1), is not comparable to § 2(a)'s use of the broad language "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure." 42 U.S.C. § 1973(a). Second, § 4 and § 2 serve separate functions and operate differently. Section 4 imposes an outright ban on tests or devices, see 42 U.S.C. § 1973b(a)(1), while § 2(a) creates a "results" test, which requires investigating and weighing numerous factors. See 42 U.S.C. § 1973(b). Given this outright ban, one can understand why Congress would want to narrow the category of voting mechanisms falling under § 4(c) relative to § 2(a), where a plaintiff need only demonstrate discriminatory results. Third, the legislative history of one provision enacted in 1965 (§ 4) has nothing to say about Congress's intentions when amending a different provision (§ 2), seventeen years later in 1982. Equivocal fragments from legislative history should not obscure the fact that, from its inception and particularly through its amendment in 1982, Congress intended that § 2, unlike § 4, be given the broadest possible reach, as the text it chose makes clear. See Chisom, 501 U.S. at 403, 111 S.Ct. 2354; Allen, 393 U.S. at 566-67, 89 S.Ct. 817.
 Not only is the majority's reliance on the legislative history of § 4 problematic, its reliance on floor statements concerning § 4(c) compounds the problems. See Maj. Op. at 318-19. Floor statements are among the most dangerous and least reliable forms of legislative history. As the Supreme Court has warned, floor statements from a handful of Senators "cannot amend the clear and unambiguous language of a statute," and there is "no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text." Barnbart v. Sigmon Coal Co., 534 U.S. 438, 457, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); see also Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 390-91, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (Scalia, J., concurring in the judgment) ("[T]he statements of individual Members of Congress (ordinarily addressed to a virtually empty floor) . . . [are not] a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us. The only reliable indication of that intent — the only thing we know for sure can be attributed to all of them — is the words of the bill that they voted to make law.").
 The danger lies in allowing "clear statutory language to be materially altered by such colloquies [by individual Congressmen], which often take place before the bill has achieved its final form," because this might "open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." Regan v. Wald, 468 U.S. 222, 237, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984). Finally, when compared to committee reports that arguably "represent[] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," floor statements "reflect at best the understanding of individual Congressmen." Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); see also Fidelity Fin. Servs., Inc. v. Fink, 522 U.S. 211, 220, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998) ("Whatever weight some Members of this Court might accord to floor statements about proposals actually under consideration, remarks that purport to clarify `related' areas of the law can have little persuasive force, and in this case none at all."); 2A Sutherland Statutory Construction § 48.13 ("Statements by individual members of the legislature about the meaning of provisions in a bill . . . are generally held not to be admissible as aids in construing the statute . . . .").
 In addition to looking at the legislative history from 1965 of another portion of the VRA, the majority also relies on Congress's silence on felon disenfranchisement in the legislative history of the 1982 amendments to § 2. See Maj. Op. at 320-21. The majority's use of silence is even worse than its use of floor debates, and the Supreme Court has repeatedly cautioned against drawing inferences from silence. See, e.g., Whitfield, 543 U.S. at 216, 125 S.Ct. 687; Wells, 519 U.S. at 497, 117 S.Ct. 921; Harrison v. PPG Indus. Inc., 446 U.S. 578, 592, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). As we opined in Lander v. Hartford Life & Annuity Insurance Co., 251 F.3d 101 (2d Cir.2001), "`[i]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute.'" Id. at 110 n. 5 (quoting United States v. Koh, 199 F.3d 632, 636-37 (2d Cir.1999)); see also Harrison, 446 U.S. at 592, 100 S.Ct. 1889 ("In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.") (citing Arthur Conan Doyle, The Silver Blaze, in The Complete Sherlock Holmes (1938)).[6] Contrary to the majority's assertion, therefore, there is nothing especially telling about Congress's silence. Moreover, Congress was neither silent nor subtle on the main question that concerns us here: whether it intended to permit discrimination in voting in any circumstance. The purpose of VRA § 2, as amended, is "to prohibit any voting practice, or procedure [that] results in discrimination." S.Rep. No. 97-417, at 2 (1982), 1982 U.S.C.C.A.N. at 179 (emphasis added). Congress could hardly have been clearer that its intention was to pass a broad remedial statute that guaranteed that no discriminatory law or device could escape scrutiny. As the Supreme Court has noted, "Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting." Chisom, 501 U.S. at 403, 111 S.Ct. 2354 (internal quotation marks omitted). The legislative intent that matters here is Congress's intent for § 2 to apply as broadly as possible.
 
 
 [3]
 Historical anecdotes
 Nor does the fact that felon disfranchisement has been a long-standing and widely-used device (it all started in Athens, we are told) mean that VRA § 2(a) does not apply. See Maj. Op. at 316-17. For starters, this is an odd argument indeed, since the very purpose of § 2(a) was to address long-standing, widely-used devices that impacted minority voting. Felon disenfranchisement laws are not the only voting qualification that existed before the Civil War; so did poll taxes, property requirements, and literacy tests to name just a few. See generally Keyssar, supra note 3, at 53-76. The majority's arguments about felon disenfranchisement apply equally to each of them. Since no one would doubt that VRA § 2(a) encompasses these voting qualifications, I am at a loss to understand why felon disenfranchisement should be treated differently.
 The VRA, as remedial legislation, was purposefully broad and flexible to accommodate changing circumstances impacting minority voting. This country's more recent history of exploding prison populations and dramatically rising incarceration rates is such a circumstance. The Bureau of Justice Statistics issues reports on state and federal prison populations. See Bureau of Justice Statistics, Prisoners Under State or Federal Jurisdiction 1977-2004, from National Prisoner Statistics data series (NPS-1) (updated Dec. 6, 2005), at http://www.ojp.usdoj.gov/bjs/data/corpop02.csv. These reports show dramatic trends in the last thirty years. In New York, for example, the state and federal prison population at the end of 1977 was 19,367 persons. Id. At the end of 1999, only twenty-two years later, New York's state and federal prison population was more than three and one-half times larger, at 72,899 persons.[7] Id. The national trends are even more dramatic. Nationwide, the state and federal prison population has increased from 300,024 persons at the end of 1977, to 1,496,629 persons at the end of 2004 — nearly five times larger in only twenty-seven years.[8] Id. Researchers estimate that the total disenfranchised population has more than doubled from 1976 to 2000. See Christopher Uggen & Jeff Manza, Democratic Contraction? Political Consequences of Felon Disenfranchisement in the United States, 67 Am. Soc. Rev. 777, 782 (2002).
 When viewed against this historical backdrop, Congress's general silence on felon disenfranchisement with respect to VRA § 2(a) makes perfect sense. The relationship between felon disfranchisement and minority voting is fundamentally different now than forty years ago when the VRA was originally passed, or even almost twenty-five years ago when the 1982 amendments were passed. The stray comments in legislative history on which the majority heavily relies are typically pulled from the 1960s and 1970s. Nearly all predate the 1982 amendments to the VRA, and nearly all were generated well before the explosive growth in this nation's prison population. It is hardly surprising that legislators did not focus on felon disfranchisement and minority voting during the debates surrounding the passage of the VRA, or even during its amendment in 1982, since the problem as it currently manifests itself did not exist.
 And again, while Congress may not have given much thought to the specific question of felon disenfranchisement, it certainly made clear its intent to outlaw any practice that resulted in discrimination in voting. To demand, as the majority does, that Congress mention every possible application of a statute in the legislative history is to prohibit Congress from passing broad remedial statutes that protect against methods of discrimination yet to be invented. The Congresses that created the VRA knew that discrimination takes many forms, and that only broad statutes — statutes that do not enumerate, in their text or in their history, every form of discrimination against which they protect — can be flexible enough to address new challenges. See H.R. Rep. No. 89-439, at 10 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2441 ("[E]ven after apparent defeat resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods.").
 D.
 Next, a minority of this Court turns to the clear statement rule. This canon of interpretation requires Congress to make its intention "unmistakably clear" when enacting statutes that would alter the usual constitutional balance between the federal government and the states. The minority's concern is that application of the VRA to New York Election Law § 5-106 would intrude into three important state functions: (1) the regulation of the franchise; (2) the state's authority to craft its criminal law; and (3) the regulation of correctional institutions. See Min. Op. at 326. The minority reasons that, to the extent the VRA would affect this balance if applied to felon disenfranchisement statutes, it must be construed not to encompass such provisions if it is unclear whether Congress intended the VRA to apply to such laws.
 For several reasons, the clear statement rule does not apply. First, for it to apply, ambiguity must exist, and § 2(a) is unambiguous. See, e.g., Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ("in the context of an unambiguous statutory text," arguments concerning whether Congress has made its intention clear are "irrelevant"); Salinas v. United States, 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("Gregory itself . . . noted [that] the principle it articulated did not apply when a statute was unambiguous.") (citing Gregory v. Ashcroft, 501 U.S. 452, 467, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)); Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 206, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (citing Supreme Court cases that "describe the plain statement rule as a rule of statutory construction to be applied where statutory intent is ambiguous") (internal quotation marks omitted).
 Second, even if VRA § 2(a) were ambiguous, the clear statement rule would still not apply because the provision is broadly worded, and the rule does not apply to broadly worded remedial statutes. As the Supreme Court has made clear, a broad statute satisfies the clear statement rule even though it does not enumerate all of its intended applications: "[T]he fact that a statute can be `applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" Yeskey, 524 U.S. at 212, 118 S.Ct. 1952 (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Congress used language in § 2 that was deliberately broad and generic. It is well-settled that "[a] statute can be unambiguous without addressing every interpretive theory offered by a party. It need only be `plain to anyone reading the Act' that the statute encompasses the conduct at issue." Salinas, 522 U.S. at 60, 118 S.Ct. 469 (quoting Gregory, 501 U.S. at 467, 111 S.Ct. 2395). Congress could hardly have been expected to have enumerated every conceivable voting qualification, prerequisite, practice, or procedure to which the statute could apply in the text, or even the legislative history, of § 2(a). To do so would have left the states free to devise new means to discriminate that were not listed. To hold that Congress did not intend the VRA to cover felon disenfranchisement statutes is to hold that Congress actually intended to allow some forms of race-based voter disenfranchisement. Such a result I find improbable — indeed inconceivable.
 Third, the clear statement rule cannot be justified by contending that unless it is applied, the VRA would improperly interfere with "sensitive domains" such as the core state function of regulating the franchise. See Min. Op. at 325, 326-27. This contention overlooks the quite obvious fact that the very purpose of the VRA was to impose Congressional regulation on the traditional state function of regulating voting. See Lopez v. Monterey County, 525 U.S. 266, 284-85, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999) ("In short, the Voting Rights Act, by its nature, intrudes on state sovereignty. The Fifteenth Amendment permits this intrusion, however . . . ."). Time and time again, the Supreme Court has held that state voting requirements are comfortably within Congress' reach under the VRA. See id. at 278, 119 S.Ct. 693 (holding that VRA's pre-clearance requirement could be applied to voting changes adopted by a non-covered state if the changes had an effect on a covered county); Young v. Fordice, 520 U.S. 273, 283-84, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997) (holding that state's new plan for separate state and federal voter registration was a discretionary change and therefore required pre-clearance under the VRA); Bush v. Vera, 517 U.S. 952, 976, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (applying VRA to state's drawing of voting districts); Chisom, 501 U.S. at 403-04, 111 S.Ct. 2354 (holding that § 2(a) of the VRA applies to state laws regarding election of state court judges); Katzenbach v. Morgan, 384 U.S. 641, 658, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (holding that state's English literacy voting requirement could not be enforced to the extent it was at odds with the VRA). Felon disenfranchisement is no more a core state function than any of these examples.
 Fourth, while it is correct that the states possess the primary authority for defining and enforcing the criminal law, United States v. Lopez, 514 U.S. 549, 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the short — and conclusive — answer is that New York Election Law § 5-106 is not a criminal law. It is a voting law found in New York's Election code, not among its criminal laws. As Judge Friendly pointed out, "[d]epriving convicted felons of the franchise is not a punishment but rather is a `nonpenal exercise of the power to regulate the franchise.'" Green v. Bd. of Elections, 380 F.2d 445, 450 (2d Cir.1967) (quoting Trop v. Dulles, 356 U.S. 86, 97, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). See also N.Y. Election Law § 1-102 ("This chapter shall govern the conduct of all elections at which voters of the state of New York may cast a ballot for the purpose of electing an individual to any party position or nominating or electing an individual to any federal, state, county, city, town or village office, or deciding any ballot question submitted to all the voters of the state or the voters of any county or city, or deciding any ballot question submitted to the voters of any town or village at the time of a general election."); N.Y. Penal Law § 1.05 ("The general purposes of the provisions of this chapter are: . . . To proscribe conduct which unjustifiably and inexcusably causes or threatens substantial harm to individual or public interests . . . .").
 Fifth, the clear statement rule is particularly inappropriate in the context of the VRA, which was enacted and amended pursuant to Congress's powers under both the Fourteenth and Fifteenth Amendments, as explained in Part C.1, supra. Contrary to the suggestion of some members of this Court, see Min. Op. at 326, the seismic shift created by the Fourteenth and Fifteenth Amendments clearly altered the federal-state balance in an attempt to address a truly compelling national interest — namely, reducing racial discrimination perpetuated by the states. Indeed, these Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." Gregory, 501 U.S. at 468, 111 S.Ct. 2395 (quoting City of Rome v. United States, 446 U.S. 156, 179, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980)); see also Mitchum v. Foster, 407 U.S. 225, 238 & n. 28, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (recognizing the "basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment" such as the Fourteenth and Fifteenth Amendments). In sum, any shift in the federal-state balance of power that would purportedly result from applying VRA § 2 to New York Election Law § 5-106 would not occur as a result of the resolution of this case. That shift occurred more than 130 years ago when the Reconstruction Amendments were passed and ratified.
 Finally, were a clear statement required, VRA § 2(a) supplies it: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a). Since § 2(a) covers all voting qualifications, it indisputably covers felon disenfranchisement laws like New York Election Law § 5-106. If anything is clear from the legislative history of the VRA it is that Congress intended to eliminate all race-based disfranchisement, no matter the means by which it was achieved.
 E.
 Next, I address Judge Walker's effort to import the Supreme Court's City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), line of cases to § 2 of the Fifteenth Amendment, and to issues of race and voting. This effort hinges on an erroneous belief that courts must first define with "precision" the scope of the constitutional right that Congress seeks to enforce. See Concurring Op. of Judge Walker at 330. His concurrence contends that, if taken at its word, VRA § 2(a) would be unconstitutional, and that a plain reading of the statute should be avoided for that reason. He believes, after defining "with precision" the constitutional right at issue, the reviewing court would look to see whether Congress explicitly identified a history and pattern of unconstitutional violations of that particular, precisely defined right, and finally, the court would assess Congress's chosen means of addressing these violations to determine whether its remedy was a congruent and proportional response to those violations. See Concurring Op. of Judge Walker at 330.
 With all due respect, this "define with precision" test as applied to issues like voting and race was invented from whole cloth. It finds no analogue in jurisprudence, and no grounding in Boerne and its progeny. This is so for a number of reasons. First, Judge Walker cites Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), in support of his "define with precision" test. See Concurring Op. of Judge Walker at 330. Garrett actually stated that courts should "identify with some precision the scope of the constitutional right at issue." 531 U.S. at 365, 121 S.Ct. 955 (emphasis added). In Garrett, this process required the Supreme Court to "examine the limitations § 1 of the Fourteenth Amendment places upon States' treatment of the disabled." Id. If we were to actually follow the Supreme Court's guidance in Garrett, we would examine the limitations § 1 of the Fourteenth Amendment and § 1 of the Fifteenth Amendment place on a state's treatment of race and voting. When this is done, it is clear that the scope of Congress's enforcement authority is at its zenith when protecting against discrimination based on suspect classifications (such as race), or when protecting fundamental rights (such as voting). Unlike the rights of the disabled at issue in Garrett, the scope of the constitutional rights at issue here are expansive, and not subject to artificial narrowing.
 The "define with precision" test is an invitation for judges to impress their subjective judgments on statutory texts. Accordingly, in this case, Judge Walker has chosen to narrowly define (to define away?) the right at issue as the right of state prisoners and parolees to vote. See Concurring Op. of Judge Walker at 330-31. Contrary to this reading of the Boerne cases, the scope of the right that Congress seeks to enforce should come from the text of the statute, not from the air or from a judge's preferences. Thus, in stark contrast to Judge Walker, Congress itself defined the right as the right to be free from any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a) (emphasis added).
 If a statute is unambiguous, a judge's role is to read and to apply it, not to rewrite it through an illusory and subjective search for "precision." If judges are free to search broad, remedial statutes for "precision" and enforce them according to what they think they find, then the coverage of such statutes is in the hands of judges, not legislators. If taken seriously, this "define with precision" test would call into question Congress's ability to pass most types of broad remedial legislation. If that test were the standard, Congress, to insulate an enactment from constitutional objection, would have to anticipate and document the need for virtually all applications of a remedial statute. This approach is, of course, completely contrary to what remedial legislation is intended to do: protect rights from encroachment by unforeseen as well as by known means.
 Fortunately, the "define with precision" test has no takers. The Supreme Court has affirmed that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 727-728, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). Moreover, when Congress "seeks to remedy or prevent unconstitutional discrimination," § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment authorize Congress "to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent." Tennessee v. Lane, 541 U.S. 509, 520, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). The Supreme Court has repeatedly referred to this enforcement power as a "broad power indeed." Lane, 541 U.S. at 518, 124 S.Ct. 1978 (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 732, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)) (citing Ex parte Virginia, 100 U.S. 339, 346, 25 L.Ed. 676 (1879)).
 Obviously, this broad power is not without limits. Since its 1997 decision in Boerne, the Supreme Court has issued several decisions concerning the scope of Congress's authority to enact prophylactic legislation under § 5 of the Fourteenth Amendment. The Supreme Court has held, for example, that Congress lacked the power under § 5 to abrogate state sovereign immunity to suit for discrimination on the basis of disability, age, and religion. See Garrett, 531 U.S. at 374, 121 S.Ct. 955 (disability); Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (age); Boerne, 521 U.S. at 536, 117 S.Ct. 2157 (religion). The Supreme Court's decisions turned on a lack of "congruence and proportionality," id. at 530, 117 S.Ct. 2157; in other words there was insufficient evidence of discrimination to justify federal intrusion into matters traditionally regulated by the states.
 By contrast, despite any number of opportunities, the Supreme Court has never questioned the constitutionality of the VRA. Indeed, the Supreme Court has referred to it as the paradigm of appropriate remedial legislation. See Hibbs, 538 U.S. at 738, 123 S.Ct. 1972 (upholding the FMLA and likening it to the VRA, which the Court described as a "valid exercise[] of Congress' § 5 power"); Garrett, 531 U.S. at 373, 121 S.Ct. 955 ("The ADA's constitutional shortcomings are apparent when the Act is compared to Congress' efforts in the Voting Rights Act of 1965 to respond to a serious pattern of constitutional violations."); Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 640, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (distinguishing the Patent Remedy Act from the VRA on account of the "undisputed record of racial discrimination confronting Congress in the voting rights cases"); Boerne, 521 U.S. at 518, 117 S.Ct. 2157 ("[M]easures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures place[ ] on the States.").
 The distinction between the VRA and other remedial legislation rests on three obvious and interrelated factors: One, the right to vote free of racial discrimination is a "fundamental principle" of the Constitution. Rice, 528 U.S. at 512, 120 S.Ct. 1044; see Morgan, 384 U.S. at 654, 652, 86 S.Ct. 1717 (describing the right to vote as "precious and fundamental" and "the right that is preservative of all rights") (internal citations omitted). Two, the country's long and persistent history of discrimination gives Congress much greater latitude in fashioning appropriate remedies for racial discrimination in voting than for other types of discrimination. See Boerne, 521 U.S. at 526, 117 S.Ct. 2157 (acknowledging "the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination"); see also Lane, 541 U.S. at 518-19 & n. 4, 124 S.Ct. 1978 (recounting that federal legislation meant to remedy racial discrimination in voting has repeatedly withstood federalism-related scrutiny); id. at 561, 124 S.Ct. 1978 (Scalia, J., dissenting) ("Giving § 5 more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctively violative of the principal purpose of the Fourteenth Amendment a priority of attention that this Court envisioned from the beginning, and that has repeatedly been reflected in our opinions."); Kimel, 528 U.S. at 83, 120 S.Ct. 631 (distinguishing age discrimination from racial discrimination because "[o]lder persons . . . unlike those who suffer discrimination on the basis of race . . . have not been subjected to a history of purposeful unequal treatment") (internal quotation marks omitted).
 And three, it is easier for Congress to show a pattern of state constitutional violations when the remedial legislation is targeted at a classification that is subject to heightened judicial scrutiny, such as race. See Hibbs, 538 U.S. at 736, 123 S.Ct. 1972 ("Because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than our rational-basis test . . . it was easier for Congress to show a pattern of state constitutional violations. Congress was similarly successful in South Carolina v. Katzenbach, where we upheld the Voting Rights Act of 1965: Because racial classifications are presumptively invalid, most of the States' acts of race discrimination violated the Fourteenth Amendment.") (citing Katzenbach, 383 U.S. at 308, 86 S.Ct. 803) (internal citation omitted); see also Lane, 541 U.S. at 529, 124 S.Ct. 1978. Thus Congress was comfortably within its expansive enforcement powers when enacting VRA § 2(a).
 Nor is the fact that Congress did not make specific findings of racial discrimination through felon disenfranchisement persuasive. Congress specifically found that racial discrimination in voting has proven resilient in the face of narrow prohibitions, in light of the ingenuity of state and local efforts to erect novel and subtle barriers to minority voting. See S.Rep. No. 97-417 at 6, 1982 U.S.C.C.A.N. at 183 ("The ingenuity of such schemes seems endless."); H.R.Rep. No. 89-439, at 10 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2441 ("[E]ven after apparent defeat resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods."). Congress determined that it was necessary to enact broad and flexible remedies to eliminate discrimination that persisted for more than 100 years after the ratification of the Fifteenth Amendment. It therefore provided that "[n]o voting qualification ... shall be imposed" if it "results" in the abridgement of the right to vote on account of race or color. 42 U.S.C. § 1973(a).
 To require Congress to catalogue a history of discrimination by specifically enumerating every conceivably discriminatory practice in order to regulate it would run directly counter to the purpose of the VRA, which was to ban discrimination not only by currently used means, but by any others that could be devised by the states. See Allen, 393 U.S. at 566, 89 S.Ct. 817 (noting that Congress expanded the language of the Act to give it "the broadest possible scope" in response to the concern that an earlier draft "was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote"). Accordingly, Congress has never been required to find that a particular voting practice had resulted in discrimination before it could ban or regulate such a practice, and the VRA has been properly applied to many discriminatory voting devices and practices that were not mentioned in the VRA's legislative history. See, e.g., Harris v. Graddick, 593 F.Supp. 128, 132-33 (M.D.Ala.1984) (applying VRA § 2 to state's hiring of a disproportionately small number of Black poll workers); Brown v. Dean, 555 F.Supp. 502, 504-06 (D.R.I. 1982) (applying VRA § 2 to location of state's polling places and finding a "constructive disenfranchisement" of minority voters); Brown v. Post, 279 F.Supp. 60, 64 (W.D.La.1968) (applying VRA § 2 to state's failure to provide voters with absentee ballots).
 In sum, Judge Walker's view that Congress lacks the authority to reach felon disenfranchisement statutes that result in the denial of the right to vote on account of race is wrong. To adopt that view is to conclude that there are some forms of race-based voter discrimination that are beyond Congress's reach, a proposition that, as we have seen, is not correct.
 * * *
 For these reasons, I respectfully dissent.[9]
 Notes:
 
 
 [1]
 I fully recognize that a statute's unambiguous terms must be read in the context of its surrounding statutory provisionsSee Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). However, whatever ambiguity Judge Jacobs' concurrence seeks to create by reference to potentially ambiguous terms in § 2(b) of the VRA is, I believe, illusory. See Concurring Op. of Judge Jacobs at 341-42; see also Maj. Op. at 321-22. As the Supreme Court explained in Chisom v. Roemer, supra,
 [t]he two purposes of the amendment [to § 2 of the VRA] are apparent from its text. Section (a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish any violation of the section. Section (b) provides guidance about how the results test is to be applied.
 501 U.S. at 395, 111 S.Ct. 2354. In other words, § 2(b) explains how plaintiffs may prove the existence of a violation after it is established that they have stated a claim under § 2(a). Thus any possible ambiguity in § 2(b) regarding the meaning of the term "to participate in the political process," 42 U.S.C. § 1973(b), does not somehow infect the clear, unambiguous meaning of the term "to vote," as used in VRA § 2(a). That section clearly and unequivocally prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a) (emphasis added).
 Moreover, the inability of a potential voter to participate in "physical" aspects of the political process (ringing doorbells, passing out leaflets, standing on soap boxes, and the like) should not be grounds to exempt less-mobile groups (the handicapped, nursing home residents, shut-ins, soldiers serving in Iraq, or United States citizens living abroad) from the protections of the VRA.
 
 
 [2]
 I note, in passing, that § 4(e) of the VRA, 42 U.S.C. § 1973b(c), was enacted to enforce the Equal Protection Clause of the Fourteenth AmendmentSee Katzenbach v. Morgan, 384 U.S. 641, 652, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).
 
 
 [3]
 When attempting historical analysis, judges are prone to oversimplify complex legislative and political problems. Limitations in the adversary process mean sacrificing nuance and detail for brevity, as I have done. For those in search of additional information on the evolution of the Reconstruction Amendments, I note that I have found the scholarship on the period to be both rich and extensive. The most comprehensive treatment of the subject remains Eric Foner'sReconstruction: America's Unfinished Revolution (1863-1877) (1988). Other solid, helpful works include David Herbert Donald et al., The Civil War and Reconstruction (2001), Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States (2000), John Hope Franklin, Reconstruction After the Civil War (2d ed.1994), Robert M. Goldman, Reconstruction and Black Suffrage: Losing the Vote in Reese and Cruikshank (2001), and William Gillette, The Right to Vote: Politics and the Passage of the Fifteenth Amendment (1969). Useful articles in legal periodicals include Gabriel J. Chin, Reconstruction, Felon Disenfranchisement, and the Right to Vote: Did the Fifteenth Amendment Repeal Section 2 of the Fourteenth Amendment?, 92 Geo. L.J. 259 (2004), Henry L. Chambers, Jr., Colorblindness, Race Neutrality, and Voting Rights, 51 Emory L.J. 1397 (2002), and Xi Wang, Black Suffrage and the redefinition of American Freedom 1860-1870, 17 Cardozo L.Rev. 2153 (1996). Suffice it to say that these suggestions do not begin to exhaust the source materials available.
 
 
 [4]
 Some scholars even suggest that the Fifteenth Amendment effectively repealed § 2 of the Fourteenth AmendmentSee, e.g., Chin, 92 Geo. L.J. at 272-87.
 
 
 [5]
 In 1970, Congress added a new provision to extend the ban on such tests and devices nationwide for a period of five years, and in 1975, Congress amended that provision to make the ban permanentSee 42 U.S.C. 1973aa; see also Pub.L. No. 94-73, § 102, 89 Stat. 400, 400 (Aug. 6, 1975); Pub.L. No. 91-284, § 6, 84 Stat. 314, 315 (June 22, 1970).
 
 
 [6]
 This "strange" canon of statutory construction, too often applied to contradict the text of a statute, was described by Justice Scalia in his dissent inKoons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004), as follows:
 I have often criticized the Court's use of legislative history because it lends itself to a kind of ventriloquism. The Congressional Record or committee reports are used to make words appear to come from Congress's mouth which were spoken or written by others (individual Members of Congress, congressional aides, or even enterprising lobbyists). The Canon of Canine Silence that the Court invokes today introduces a reverse — and at least equally dangerous — phenomenon, under which courts may refuse to believe Congress's own words unless they can see the lips of others moving in unison.
 Id. at 73-74, 125 S.Ct. 460 (Scalia, J., dissenting) (emphasis in original); see also Small v. United States, 544 U.S. 385, 125 S.Ct. 1752, 1765, 161 L.Ed.2d 651 (2005) (Thomas, J., dissenting) ("Reliance on silence in the history is a new and even more dangerous phenomenon.").
 
 
 [7]
 Since then, New York's state and federal prison population has fallen to 63,751 at the end of 2004 (the last date for which data is available from the Bureau of Justice Statistics), though this is still over three times the state and federal prison population in New York at the end of 1977See Bureau of Justice Statistics, Prisoners Under State or Federal Jurisdiction 1977-2004, from National Prisoner Statistics data series (NPS-1) (updated Dec. 6, 2005), at http://www.ojp.usdoj.gov/bjs/data/corpop02.csv.
 
 
 [8]
 Even if you select 1982 as the baseline —i.e., the year when VRA § 2 was amended — the numbers are still dramatic. In New York, the state and federal prison population grew by more than two and one-half times (from 27,945 persons at the end of 1982 to 72,899 persons at the end of 1999). Nationwide, the state and federal prison population grew by more than three and one-half times (from 413,806 persons at the end of 1982 to 1,496,629 persons at the end of 2004). See Bureau of Justice Statistics, Prisoners Under State or Federal Jurisdiction 1977-2004, from National Prisoner Statistics data series (NPS-1) (updated Dec. 6, 2005), at http://www.ojp.usdoj.gov/bjs/data/corpop02.csv.
 
 
 [9]
 For the same reasons that theHayden plaintiffs' vote denial claims should go forward, I believe that their vote dilution claims also should go forward. Because felon disenfranchisement statutes clearly can be scrutinized under VRA § 2, the Hayden plaintiffs deserve the opportunity to present facts and try to prove their claim that New York's felon disenfranchisement law dilutes the voting strength of minority communities through out New York State. See Hayden First Amended Complaint at ¶¶ 92-93. Moreover, the Hayden plaintiffs deserve the opportunity to fully brief and undertake to prove their additional claim that New York's apportionment process — which counts incarcerated felons as residents of the communities in which they are incarcerated — results in dilution of minority votes in violation of the VRA. (In this regard, and in this regard only, I agree with the majority. See Maj. Op. at 329.)
 CALABRESI, Circuit Judge, dissenting.
 The majority opinion is learned, thoroughly researched, well-written, and restrained — but it is almost totally irrelevant to the question presented in this case. The majority demonstrates beyond peradventure that Congress did not intend the Voting Rights Act to prohibit felon disenfranchisement categorically, as that statute categorically prohibits, for instance, the use of literacy tests and "good moral character" requirements in certain jurisdictions. See 42 U.S.C. §§ 1973b(a), (c). And if the plaintiffs were, in fact, arguing that the Voting Rights Act erects a per se ban on felon disenfranchisement, I would readily join the majority. But, of course, this is not the plaintiffs' position. Rather, they contend that the Voting Rights Act prohibits felon disenfranchisement laws that result in the denial or dilution of voting rights on the basis of race. Their complaint alleges that New York Election Law § 5-106 has precisely this result, and, as Judge Parker notes in his dissent, we are bound to accept this allegation as the gospel truth for purposes of New York's motion for judgment on the pleadings. Nothing in the majority opinion — nor, for that matter, in the concurrences[1] — gives a single reason to suggest that Congress did not intend the Voting Rights Act to do what its plain language says and bar felon disenfranchisement statutes that result in racial discrimination. I, therefore, see no basis for depriving the plaintiffs of the right to prove their allegations.
 I join Judge Parker's well-reasoned dissent.[2] I write separately simply to emphasize how completely, in my view, the majority's analysis misses the actual issue of the case, and to muse as to what could have led my learned colleagues to affirm the district court when, as Judge Parker's dissent demonstrates, all of the canonical indicators of legislative intent — statutory text, context, and legislative history — so clearly point in the opposite direction.
 
 
 *
 The bulk of the majority opinion[3] is devoted to discussing (1) congressional statements that § 4(c) of the Voting Rights Act (which bans some practices outright) did not reach felon disenfranchisement,[4] (2) failed efforts to amend the statute to ban felon disenfranchisement outright, and (3) congressional actions that presuppose the validity of felon disenfranchisement in some circumstances. Whatever interest such subjects may hold in the abstract, they have no more bearing on the issue at hand than do the punitive practices of ancient Greeks or medieval Britons, which the majority opinion also canvasses.
 The majority's discussion of § 4(c) illustrates the point. That provision categorically forbids the use of "any test or device," including "good moral character" requirements, in covered jurisdictions.[5] See 42 U.S.C. § 1973b(c). In other words, such tests and devices are forbidden whether or not they can be shown to have discriminatory results. The majority makes much of legislative history showing that Congress did not intend § 4(c) to forbid felon disenfranchisement. True enough. Felon disenfranchisement is not prohibited in the absence of a showing that it brings about discriminatory results. But the statements in legislative history that felon disenfranchisement is not banned by § 4(c) cannot be taken to imply a wholesale carve-out that exempts felon disenfranchisement from Voting Rights Act scrutiny altogether, as the majority asserts. Rather, such legislative statements simply make the uncontroversial point that felon disenfranchisement laws are not "good moral character" requirements within the meaning of § 4(c). That, however, is not the issue before us. The fact that race-neutral felon disenfranchisement is permissible under § 4(c) tells us nothing at all about whether § 2 allows racially discriminatory felon disenfranchisement. And, as Judge Parker shows, the language of § 2(a) makes perfectly plain that such discriminatory disenfranchisement is barred.
 The majority also tells us that some members of Congress tried, unsuccessfully, to amend the Voting Rights Act "to prohibit the States from denying the right to vote in Federal elections to former criminal offenders who have not been convicted of any offense related to voting or elections and who are not confined in a correctional institution." Maj. Op. at 319 (quoting H.R. 15049, 92d Cong. (1972)). Once again, this does indeed imply that the Voting Rights Act does not, of itself, prohibit all felon disenfranchisement — a fact that no one disputes. How the majority moves from the fact that Congress declined to proscribe race-neutral felon disenfranchisement to the conclusion that Congress intended to exempt racially discriminatory felon disenfranchisement from the coverage of the Voting Rights Act is beyond me. It is perfectly clear that voting practices and procedures that are not per se impermissible under the Voting Rights Act — at-large voting and multi-member districts, for instance — violate the statute when they produce discriminatory results. See Thornburg v. Gingles, 478 U.S. 30, 48, 80, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (recognizing that "[m]ultimember districts and at-large election schemes ... are not per se violative of minority voters' rights," but affirming the district court's conclusion that the multimember electoral structure at issue did violate § 2 because it resulted in racially discriminatory vote dilution) (internal quotation marks and alteration omitted). And so it is with felon disenfranchisement laws. The majority has shown that some members of Congress thought felon disenfranchisement to be so inimical to voting rights as to try to forbid the practice even in the absence of discriminatory effects. The idea that such congressional efforts somehow imply the existence of a "safe harbor" for felon disenfranchisement statutes that do result in racially discriminatory denials or dilutions of voting rights is, it seems to me, risible.
 Nor do subsequent enactments that presuppose the validity of felon disenfranchisement laws (e.g., a provision of the Help America Vote Act of 2002, 42 U.S.C. § 15483(a)(2)(A)(ii)(I)), or bills that seek to limit felon disenfranchisement (e.g., the Ex-Offenders Voting Rights Act of 2005, H.R. 663, 109th Cong. (2005)), suggest in the slightest that Congress understands discriminatory felon disenfranchisement to be consistent with the Voting Rights Act.
 Still, the majority concludes, largely based on the statutory history recounted above, that "the Voting Rights Act does not apply to felon disenfranchisement provisions." Maj. Op. at 322. What is behind this remarkable decision to buck text, context, and legislative history in order to insulate a particular racially discriminatory practice from an anti-discrimination rule of general applicability?
 II
 
 
 I
 believe the majority opinion and, perhaps especially, the concurrence of Judges Straub and Sack are motivated in large part by skepticism that Congress could have intended the result that the plaintiffs urge[6], But it is important here, in talking about congressional intent, to distinguish between the enacting Congress and the current Congress. It is, of course, the legislative intent of the enacting Congress — not the current Congress — that is controlling. See, e.g., European Cmty. v. RJR Nabisco, Inc., 355 F.3d 123, 136 (2d Cir.2004) ("[E]xpressions of legislative intent made years after the statute's initial enactment are entitled to limited weight under any circumstances ...."), rev'd on other grounds, 544 U.S. 1012, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005); see also United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance.") (internal quotation marks omitted). And I see no reason to think that the 97th Congress, which was responsible for the "dramatic substantive transformation" of the Voting Rights Act in 1982, meant the expansive prohibition of discriminatory results it enacted to apply in any other way than precisely as written. Thomas M. Boyd & Stephen J. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347, 1347 (1983). The fact that the 109th Congress in the year 2006, if asked, might very well choose not to invalidate felon disenfranchisement laws that produce discriminatory results in no way indicates that the very different Congress of a generation ago made, or would now make, the same choice.
 It may be that the current Congress would rather not see state felon disenfranchisement statutes invalidated under the Voting Rights Act even when these resulted in racial discrimination. And some scholars, myself included, have suggested that it might be a good idea if, as a starting point, in certain circumstances, courts were permitted to read the law according to what they perceived to be the will of the current Congress, rather than that of a long-gone-by one. See Guido Calabresi, A Common Law for the Age of Statutes (1982); see also William N. Eskridge, Jr., Dynamic Statutory Interpretation (1994). But whatever the merits of such an arrangement in the abstract, it is simply not a part of our legal system.
 Moreover, the only justification for such statutory updating, even in theory, is that the legislature may be stalled by inertia, with the result that an outmoded and antimajoritarian statutory scheme becomes fixed in stone. See Calabresi, A Common Law for the Age of Statutes 120-21. This is hardly the case here, for important portions of the Voting Rights Act will be before Congress next year for reauthorization. See 42 U.S.C. §§ 1973b(a)(8), 1973aa-1a(b)(1). The reauthorization process removes most inertial barriers to lawmaking, so that if a majority in Congress wishes to amend the statute to permit even discriminatory felon disenfranchisement, it will be able to do so easily.[7] Cf. William N. Eskridge, Jr., et al., Cases and Materials on Legislation: Statutes and the Creation of Public Policy 66-67 (2001) (discussing procedural obstacles that ordinarily can prevent the enactment of laws that have the support of a legislative majority).
 Significantly, any such amendment will take effect long before Hayden and the other class plaintiffs, whose case is only at the pleading stage, ever reach a ballot. Thus, the fact that Congress will soon take up the Voting Rights Act removes even the most academic of reasons for the Court to take the matter into its own hands and impose a statutory construction deeply at odds with the language of the statute and with the intention of the original enacting Congress "to give the Act the broadest possible scope." Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Our unwillingness to let the statute apply as it is written unless and until Congress changes it in 2007 is, to me, mind-boggling. Accordingly, I respectfully dissent.
 Notes:
 
 
 [1]
 Three of the concurrences — Chief Judge Walker's, Judge Jacobs's, and Judge Raggi's — offer additional arguments in support of affirmance. I join fully in Judge Parker's analysis and rejection of those arguments
 I would, however, make a couple of additional comments on the position Judge Jacobs takes. First, it is worth noting that the lead plaintiff in this case, Joseph Hayden, is on parole, as are some of the other named plaintiffs. As a result, as far as this law concerns these plaintiffs, none of the horribles that Judge Jacobs raises apply. Mr. Hayden, and others like situated, can, as far as I know, pass out leaflets, make public speeches about candidates, and eat with a knife and fork.
 Second, and more important, no one seems to doubt that felon disenfranchisement based on intentional discrimination, rather than discriminatory results, is prohibited by the Voting Rights Act. Cf. Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). And yet precisely the same supposed anomaly on which Judge Jacobs erects his argument — i.e., the prospect of felons participating in those parts of the political process that would require them to move about freely — would apply in that situation. Does anyone think that felons who were intentionally — and hence, manifestly improperly — barred from voting on racial grounds, would, as a result of that intentional wrong, be permitted to petition, go door to door, or otherwise participate fully in the political process? Not if such felons were still in jail they couldn't. Judge Jacobs proves too much.
 * * *
 In the last sentence of his footnote answering my dissent, my learned colleague and friend, Judge Jacobs, lets the cat out of the bag. He reveals why he, and perhaps some others in the majority, read this statute as he does. He feels so strongly that barring prisoners from voting — regardless of discriminatory results — is correct that he cannot imagine a legislature, present or past, thinking otherwise; he believes that would defy common sense. I don't agree. Still, that is his intuition. Some have suggested that such an intuitional basis for judicial decision-making is appropriate in the slow articulation of the common law. But projecting current judges' feelings onto a past legislature, and, on that basis, rewriting a statute — without any support in text, context, or even legislative history — is both inappropriate and highly dangerous.
 
 
 [2]
 While I agree wholeheartedly with Judge Parker's dissent in every other respect, my own view of the permissibility of using "extrinsic aids" like context in statutory interpretation is closer to Judge Katzmann's than to Judge Parker's. To understand what words mean, it is sometimes necessary to understand the situations in which they are used. (Thus, "`[y]ou should have passed, dummy,' means something entirely different at a bridge table from what it means on Superbowl Sunday."Peterson Marital Trust v. Comm'r, 78 F.3d 795, 796 (2d Cir.1996)). In particular, knowing the circumstances that led to a law's enactment may be helpful, or even essential, in understanding the meaning of the statutory text. And so it was that English courts, although forbidden to consult Hansard (i.e., the parliamentary debates) in construing statutes, regularly interpreted a statute's language in light of "the mischief" the law was enacted to cure. See Gorris v. Scott, 9 L.R. Exch. 125 (1874).
 Here, the language of § 2(a) that we are asked to apply was adopted in 1982 in order to override the Supreme Court's holding in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), that § 2 violations require proof of discriminatory purpose. That is, the context of the amended statute before us is Congress's insistence that the Voting Rights Act encompass practices that produce discriminatory results — which, again, is exactly what the plaintiffs allege with respect to felon disenfranchisement. Hence, the statute's context, like its text, clearly points towards allowing the plaintiffs' case to proceed.
 
 
 [3]
 In referring to the "majority opinion," I exclude those portions of Judge Cabranes's opinion that seek to apply a "clear statement rule," as those portions only command the support of a minority of the Court
 
 
 [4]
 The majority makes a point of distinguishing between "felon disenfranchisement statutes" (which continue to bar voting after sentence has been served) and "prisoner disenfranchisement statutes" (which block voting only during incarceration and parole). Because no argument has been advanced for why the two sorts of statutes should be treated differently under the Voting Rights Act, I refer to both as "felon disenfranchisement statutes."
 
 
 [5]
 To be precise, § 4(a) prohibits "any test or device," and § 4(c) defines what is covered under that ban (including,inter alia, good moral character requirements). See 42 U.S.C. §§ 1973b(a), (c).
 
 
 [6]
 In a characteristically thoughtful opinion, Judge Sack expressly denies that he is moved at all by what the current Congress thinks the statute should mean. He is joined in this respect by Judge Straub. I cannot, of course, traverse that statement. But I still can find no other justification for the position he adopts
 Judge Sack admits that the language of the 1982 amendments would seem to apply to the Voting Rights Act. So much for text. But he bases his argument firmly on context, claiming that when context is sufficiently clear, it can trump text. Perhaps. But the context of the 1982 amendments does not provide support for Judge Sack's position.
 We can all agree that the immediate motivation for the 1982 amendments was City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which the Supreme Court had held that § 2 barred only those voting measures motivated by a discriminatory purpose, and not those that only produced discriminatory results. Bolden had over-turned a number of lower court decisions that had held plaintiffs could make out a violation of the Voting Rights Act by showing discriminatory results. See, e.g., Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc). All these cases dealt with discriminatory vote dilution claims relating to legislative redistricting plans. Congress responded by pronouncing, in the broadest and most general of terms, that voting measures that result in discrimination do, in fact, violate the Voting Rights Act.
 The applicable context for the 1982 amendments, then, is quite simple. (1) The Supreme Court had rejected a results standard for the Voting Rights Act, and (2) Congress, in turn, reinstated a results standard in clear language. Judge Sack agrees that Congress reinstated a results standard, but contends that the scope of that results standard is limited.
 Does Judge Sack mean to argue that, except as to cases involving dilution in redistricting, the amended Voting Rights Act is only violated by intentional discrimination, rather than discriminatory results — that is, that the Voting Rights Act requires a discriminatory intent in all the myriad other situations to which it applies? I very much doubt it. It would appear, then, to be his position that the amendments do impose a results standard beyond the specific context of Bolden — but just not for felon disenfranchisement. But if this is the line that Judge Sack would draw, he gives no reason for it. Indeed, even if one were to understand the 1982 amendments to impose a results standard only for vote dilution claims — a restrictive reading for which I find no justification — it is worth noting that the plaintiffs here do allege dilution, as well as denial (and not only dilution resulting from New York's system of apportioning electoral districts, as to which the majority is remanding).
 In fact, context provides no good reason for any restrictive reading of § 2. Congress could have said that redistricting plans that result in discriminatory vote dilution (i.e., the specific circumstances of Bolden) violate the Act. But it didn't. And nothing in the history of the 1982 amendments supports any conclusion other than that Congress said exactly what it meant.
 
 
 [7]
 Some may anticipate — and fear — that a decision in Hayden's favor would prompt Congress to respond by amending the Voting Rights Act in ways that would limit its scope markedly. However justified these concerns may be, they cannot form a basis for ignoring clear statutory text
 SOTOMAYOR, Circuit Judge, dissenting.
 
 
 I
 join in Judge Parker's dissent, and write this separate opinion only to emphasize one point. I fear that the many pages of the majority opinion and concurrences — and the many pages of the dissent that are necessary to explain why they are wrong — may give the impression that this case is in some way complex. It is not
 It is plain to anyone reading the Voting Rights Act that it applies to all "voting qualification[s]." And it is equally plain that § 5-106 disqualifies a group of people from voting. These two propositions should constitute the entirety of our analysis. Section 2 of the Act by its unambiguous terms subjects felony disenfranchisement and all other voting qualifications to its coverage.
 The duty of a judge is to follow the law, not to question its plain terms. I do not believe that Congress wishes us to disregard the plain language of any statute or to invent exceptions to the statutes it has created. The majority's "wealth of persuasive evidence" that Congress intended felony disenfranchisement laws to be immune from scrutiny under § 2 of the Act, Maj. Op. at 322, includes not a single legislator actually saying so. But even if Congress had doubts about the wisdom of subjecting felony disenfranchisement laws to the results test of § 2, I trust that Congress would prefer to make any needed changes itself, rather than have courts do so for it.
 
 
 I
 respectfully dissent
 KATZMANN, Circuit Judge, dissenting.
 As a matter of public policy, I do not doubt that it may well be rational for the state to enact laws — applied fairly and equally, regardless of race, creed, color, religion or gender — that deprive felons of the right to vote while serving their sentences. At the same time, I am mindful that the task of a court is not to make policy or to substitute its views for that of political branches, but rather to be faithful to the words of a statute. In the case at hand, Congress stated:
 No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color... as provided in subsection (b) of this section.
 42 U.S.C. § 1973(a). I believe that this language of the Voting Rights Act is facially unambiguous and that New York Election Law § 5-106 imposes a "voting qualification or prerequisite to voting or standard, practice, or procedure." In my view, the plain text of the Voting Rights Act therefore encompasses the claim that appellants have pleaded, and thus allows appellants to try to show a violation. But in construing a broad, unambiguous statute, my inquiry as to its meaning does not necessarily end with the text.
 To be sure, in the ordinary course, caselaw instructs that courts should be loathe to go beyond the text of an unambiguous statute. See, e.g., Lee v. Bankers Trust Co., 166 F.3d 540, 544 (2d Cir.1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation and that judicial review must end at the statute's unambiguous terms.") (internal citations omitted). However, that is not to say that a court must always and slavishly look only to the text of a statute when seeking to understand its meaning, just because the text is seemingly clear in isolation. A statute that is broadly worded, albeit facially unambiguous, can be reasonably construed in a variety of ways consistent with its text, but construing text without context can lead to results that Congress did not intend or that are even absurd. I am of the view that legislative history — in reliable form, such as conference committee reports and the floor statements of managers — can be useful in discerning legislative meaning when the statutory text is susceptible to different interpretations and the plain language alone yields results that are surprising or absurd (of course, where further investigation reveals that Congress did intend such results, courts must be faithful to Congress's meaning). See William N. Eskridge, Jr., et al., Legislation and Statutory Interpretation 300-01 (2000); Robert A. Katzmann, Courts and Congress 62-68 (1997).
 Thus, although we agree as to the outcome, I part company with Judge Parker's powerful dissent as to interpretive method. That is, I do not agree that the majority engages in an improper inquiry by examining the legislative history of the Voting Rights Act with respect to felon disenfranchisement policies, notwithstanding that the broadly worded and facially unambiguous text of 42 U.S.C. § 1973(a) literally covers such policies as readily as it does any others that result in the denial of the right to vote on account of race or color. Because § 1973(a) does not speak specifically to the question we address today, if I saw clear evidence in the authoritative legislative history that the Congress that enacted it intended to exclude felon disenfranchisement policies from its reach, I would so construe it. But when we look to the authoritative legislative history of § 1973(a)'s enactment in 1982 — the materials directly relevant to our present inquiry, under conventional methods of statutory analysis — or even to activity in the immediately preceding Congress, we find complete silence as to whether Congress intended to exclude felon disenfranchisement policies from its reach. Surely, the silence of enacting legislators cannot overcome the unambiguous and broadly worded provisions of a statute that was meant to apply to a multitude of state policies not specifically enumerated in its text — notwithstanding the majority's references to congressional activity in legislative sessions far removed from the Congress that enacted § 1973(a) in 1982, as well as to Congress's assumptions in enacting unrelated legislation.
 
 
 I
 see no precedent for not following the plain language under these circumstances. What we have here cannot be that rare situation where "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters,"United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotations omitted), because we have literally no evidence as to the intention of the drafters of the 1982 provision specifically with respect to felon disenfranchisement policies. Moreover, because reasonable people can differ over the wisdom of extending the Act's coverage to felon disenfranchisement policies, such a result cannot be considered "absurd" or "unthinkable." See Green v. Bock Laundry Machine Co., 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (Scalia, J., concurring). If Congress has a different view, then it is free to amend § 1973(a) accordingly. But this court has no license on its own to do so.
 Cases of statutory interpretation are sometimes decided by judges' differing views as to when it is appropriate to look beyond the plain text of the statute and examine authoritative legislative history, but this is not such a case. Whether one stops with the plain language of an unambiguous provision, as Judge Parker advocates, or looks at the authoritative legislative history in addition, as I do, the result should be the same.
 Order Clarifying Opinion
 June 1, 2006.
 PER CURIAM:
 We write nostra sponte to clarify further proceedings contemplated by the mandate of the en banc Court in this matter. See Hayden v. Pataki, 449 F.3d 305, 2006 WL 1169674 (2d Cir. May 4, 2006).
 Plaintiffs-appellants filed a class action complaint pursuant to 42 U.S.C. § 1983 that sought to invalidate the felon disenfranchisement provisions found in New York Constitution Article II, § 3 and New York Election Law § 5-106. Plaintiffs-appellants claimed that these provisions violated their rights under the First, Fourteenth, and Fifteenth Amendments, Section 2 of the Voting Rights Act of 1965 (codified at 42 U.S.C. § 1973), the Civil Rights Acts of 1957 and 1960 (codified at 42 U.S.C. §§ 1971(a)(1), 1971(a)(2)(A) & 1971(a)(2)(B)), and certain treaties and customary international law. On June 14, 2004, the District Court issued a memorandum and order granting defendants-appellees' motion for judgment on the pleadings and dismissing all of plaintiffs-appellants' claims. See Hayden v. Pataki, No. 00 Civ. 8586(LMM), 2004 WL 1335921 (S.D.N.Y. June 14, 2004). On June 16, 2004, the District Court entered judgment on behalf of defendants-appellees.
 On July 13, 2004, plaintiffs-appellants filed a timely Notice of Appeal in the District Court, a copy of which was received and docketed by the Court of Appeals on July 23, 2004. The parties then submitted briefs according to the following schedule: on September 27, 2004, plaintiffs-appellants filed an opening brief, on November 24, 2004, defendants-appellees filed a response brief; and on December 8, 2004, plaintiffs-appellants filed a reply brief. However, at the instruction of Chief Judge Walker on February 17, 2005, this case was held in abeyance and not assigned to a three-judge panel, pending a determination by the Court whether to consolidate the case with Muntaqim v. Coombe, No. 01-7260, see Muntaqim v. Coombe, 366 F.3d 102 (2d Cir.2004), in which an en banc proceeding was then pending.
 By order of the en banc Court on February 24, 2005, this case was then consolidated with Muntaqim, and accepted for appeal directly to the en banc Court for consideration of the single "common issue of law" presented in both Muntaqim and Hayden — namely, "whether, on the pleadings, a claim that a New York State statute, Section 5-106 of the New York Election Law, that disenfranchises currently imprisoned felons and parolees results in unlawful vote denial and/or vote dilution can state a claim for violation of Section 2 of the Voting Rights Act." Order of Feb. 24, 2005.
 The en banc Court deconsolidated Muntaqim by order of May 4, 2006, and entered a judgment of dismissal of Muntaqim's claims for want of standing. See Muntaqim v. Coombe, 449 F.3d 371, 2006 WL 1359890 (2d Cir. May 4, 2006) (per curiam). Then, in this case, the en banc Court proceeded to answer the question noted above in the negative, in an opinion filed May 4, 2006. See Hayden v. Pataki, 449 F.3d 305, 2006 WL 1169674 (2d Cir. May 4, 2006). The en banc Court expressly did not consider, much less decide, whether plaintiffs-appellants had also stated a claim on behalf of plaintiffs who are neither incarcerated nor on parole that their votes are "diluted" because of New York's apportionment process, "which counts incarcerated prisoners as residents of the communities in which they are incarcerated, and has the alleged effect of increasing upstate New York regions' populations at the expense of New York City's." Id. at *15; see also id. at *45 n. 9 (B.D. Parker, J., dissenting) (indicating that "the Hayden plaintiffs deserve the opportunity to fully brief and undertake to prove their additional claim that New York's apportionment process — which counts incarcerated felons as residents of the communities in which they are incarcerated — results in dilution of minority votes in violation of the VRA"). The en banc Court remanded Hayden to the District Court to consider, in the first instance, "whether plaintiffs have indeed properly raised the claim, and, if so, to rule on the merits of the claim." Id. at *15. In doing so, we stressed that because the apportionment issue "was neither considered by the District Court nor briefed by defendants, we intimate no view on the question." Id.
 In order to enhance the orderly and efficient administration of justice, we continue to believe that the proper course of action is for the District Court to address this possible vote dilution claim before a regular three-judge panel considers the other federal constitutional, statutory, and international law arguments raised by plaintiffs-appellants in their original appeal from the District Court's ruling (which were not addressed in the en banc Court's ruling on plaintiff-appellants' VRA claim). By proceeding in this manner, we hope to avoid multiple appeals in the future.
 Thus, to clarify, the Clerk of Court is directed to issue the mandate for this case forthwith and remand this case to the District Court for the limited purpose of considering whether plaintiffs-appellants properly stated a vote dilution claim based on New York's apportionment process, and, if so, to rule on the merits of that claim. However, the Court of Appeals will retain jurisdiction over the remaining claims raised by plaintiffs-appellants in their original briefs on appeal, which will continue to be held in abeyance until after the District Court addresses this vote dilution issue on remand. Any party seeking appellate review of the decision of the District Court on remand shall so inform the Clerk of this Court within 30 days of that decision. Jurisdiction will then automatically be restored to the Court of Appeals without the need for an additional notice of appeal, and in the normal course the matter will be referred to a regular three-judge panel, to be heard along with the remaining claims raised by plaintiffs-appellants in their original briefs on appeal. Cf. United States v. Jacobson, 15 F.3d 19, 21-22 (2d Cir.1994).